**UNITED STATES of America**

v.

**Steven BUNNELL, Defendant.**

**No. 00–36–P–C.**

United States District Court,
D. Maine.

July 11, 2000.

Henry W. Griffin, Lewiston, ME, for Steven Bunnell, Defendant.

Helene Kazanjian, Office of U.S. Attorney, Portland, ME, for U.S.

MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

Defendant has filed a Motion to Dismiss the Indictment (Docket No. 8) and a Motion to Suppress (Docket No. 9). The Government opposes both Motions. See Docket Nos. 13 and 14.

## I. FACTS

On August 25, 1998, Lisa Bunnell, Defendant's ex-wife, applied to the Maine District Court for an order of protection from Defendant. A temporary order for protection was issued that day after an *ex parte* hearing. Government. Ex. 1. The order contained a notice to Defendant that Lisa Bunnell had initiated a protection from abuse/harassment action and that he or his attorney had to appear before the court on September 11, 1998, at 9:00 a.m. The order contained the following warning in bold typeface:

IMPORTANT WARNING: IF YOU FAIL TO APPEAR AT THE COURT AT THE ABOVE STATED TIME, OR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, COURT ORDERS EFFECTIVE FOR UP TO TWO YEARS MAY BE ENTERED AGAINST YOU IN YOUR ABSENCE GRANTING ANY OR ALL OF THE RELIEF REQUESTED IN THE COMPLAINT. THE VIOLATION OF THESE ORDERS MAY CONSTITUTE A CLASS D CRIME OR CONTEMPT OF COURT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT FAIL TO APPEAR AT THE REQUIRED TIME. YOU MAY OBTAIN A BOOKLET OF INFORMATION ABOUT PROTECTION FROM ABUSE/HARASSMENT CASES FROM THE CLERK OF COURT.

Government Ex. 1. Lewiston Police Officer Timothy Morin served the temporary order on Mr. Bunnell by hand on August 25, 1998. Government Ex. 1.

On September 11, 1998, a hearing was held on the permanent order. Defendant did not appear at the hearing. The court issued a permanent order, and Lewiston Police Officer Michael E. Whalen served the permanent order on Defendant that day. Government Ex. 2. The permanent order restrained Defendant from harassing, stalking, or threatening Lisa Bunnell, and it explicitly prohibited the use, attempted use or threatened use of physical force against Lisa Bunnell that could reasonably be expected to cause bodily injury. Government Ex. 2. The permanent order was valid until September 25, 2000.

On April 3, 2000, Officer Scot Bradeen of the Lewiston Police Department received information from a man serving with Defendant in the National Guard who was concerned that Defendant might harm his ex-wife after hearing him threaten her during a training exercise in which Defendant was firing an M–60 machine gun. The man also told Bradeen that he had seen Defendant in possession of a Colt AR–15—the civilian version of the M–16 assault rifle—and that Defendant told the informant that he wanted to rent the apartment in which, in the summer of 1999, a man had shot and killed his ex-wife or girlfriend. Bradeen's investigation showed that Defendant was subject to an active protective order issued by the Maine District Court relating to Lisa Bunnell. Bradeen obtained a copy of the outstanding protective order which provided that possession of a firearm was a Class D crime. Government Ex. 2. Finally, Officer Bradeen's investigation showed that Defendant was indeed living in the apartment where a woman had been shot less than a year earlier. Bradeen put the information in an affidavit and went to the courthouse to obtain an arrest warrant for Defendant.

Police Sergeant Michael Bussiere arrived for work at the Lewiston Police sta-

tion at 3:00 p.m. At that time, he was told that Officer Bradeen was attempting to get an arrest warrant for Defendant. Sergeant Bussiere did not think Bradeen would be successful because the information was stale and the incident at the National Guard firing range took place in another county. Nevertheless, two officers were stationed outside Defendant's apartment. Shortly thereafter, Defendant went to Elizabeth Ann's, a local convenience store. At approximately 4:00 p.m., Bussiere, Officer Matthew Cashman, and Officer Ray Roberts entered Elizabeth Ann's. Bussiere approached Defendant and asked him if he was Steven Bunnell. After Defendant confirmed that he was, Bussiere asked "Do you mind if we talk for a minute?" Defendant responded "sure," indicating that he would not mind. Defendant and Bussiere went to the back of the store where inventory was kept. Officer Cashman joined them in the storeroom and Officer Roberts remained in a hallway between the storeroom and the store.

Once in the storeroom, Bussiere asked Defendant if he had an active protective order against him and Defendant responded that he did. Bussiere then told Defendant that he was not under arrest but that he, Bussiere, was investigating a claim that Defendant possessed a firearm and that the protective order prohibited him from possessing a firearm. Defendant seemed surprised and stated that he did not know that he could not possess a firearm. When asked if he had a firearm, Defendant responded that he did not have it with him, but that back at his apartment, there was a Colt AR–15. Defendant also stated that he did not want to have a firearm if he was not supposed to have one and he suggested that they go to his apartment so that he could turn over the firearm.

Outside of Elizabeth Ann's, Cashman offered to drive Defendant to his apartment. Before putting Defendant in his patrol car, Cashman patted Defendant down for weapons and found a Leatherman pocket tool kit. For safety reasons, Cashman kept the Leatherman and placed Defendant in the back seat of the car. Cashman and Defendant arrived at the apartment first. It was approximately 4:15 p.m. After they arrived at the apartment, Cashman let Defendant out of the car but told Defendant to wait until the other officers arrived to go inside. While they waited, Cashman remained within arm's length of Defendant. A few minutes later, when the other officers arrived, Defendant led the officers into the apartment. Once in the apartment, Bussiere advised Defendant that he did not have to turn over the gun. Defendant told the officers that he wanted to give them the gun. Bussiere then asked if they could search Defendant's apartment for firearms, and Defendant responded that he wanted the officers to search thoroughly so that they knew that he did not have any weapons and would not need to come back. Bussiere radioed one of the nearby detectives to bring a consent form to the apartment. Defendant then went to get the gun from the back bedroom and was told by Officer Cashman to stay in the kitchen while he, Cashman, retrieved the gun. Tr. 62. Bussiere reaffirmed the direction for Defendant to go into the kitchen and asked him to sit at the table to talk with him. Tr. at 33–34, 114–15.

While Defendant was being questioned in the kitchen, Roxanne Palumbo, Defendant's roommate, was being kept in the living room. Palumbo was told to stay in the living room and that she could not go into the kitchen. Tr. at 124, 130. Roberts stood in the living room by the front door of the apartment while he questioned Palumbo. Defendant, while seated at the table and aware that Cashman was having difficulty finding the weapon, gave more detailed instructions regarding the location of the gun. Within a few minutes, Officer Cashman located the gun and brought it into the living room. Two additional officers, Chick and St. Pierre, arrived with a consent-to-search form. Bussiere and Defendant were seated at the kitchen table

where, after Bussiere or Chick explained the form, Defendant signed it. Government's Ex. 3. Cashman located the gun at the same time that Defendant signed the consent-to-search form. The search of the apartment turned up four loaded magazines for the Colt AR–15, taped together, and a copy of the protective order.

With Cashman's search was almost complete, Bussiere radioed Bradeen to inquire about the status of the "paperwork." At the time he received the radio call, Bradeen had already obtained an arrest warrant for Defendant and he was in the court clerk's office making copies. Bradeen told Bussiere that he had the "paperwork" and would be right over to the apartment. At approximately 5:30 p.m., when Bradeen arrived, he questioned Defendant for ten to fifteen minutes before he placed him under arrest. Among the statements Defendant made to Bradeen was that he lost his copy of the protective order. Defendant was never given a *Miranda* warning until after he was formally arrested.

On April 26, 2000, the federal grand jury returned the Indictment charging Defendant with one count of possession of a firearm by a person subject to a court order, specifically an order of protection, in violation of 18 U.S.C. § 922(g)(8).

## II. MOTION TO DISMISS

Defendant argues that the Indictment should be dismissed because the statute is unconstitutional in that it (1) is an unconstitutional exercise of Congress' powers under the Commerce Clause; (2) violates his rights to due process and equal protection and his right to counsel under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and (3) violates the Tenth Amendment to the United States Constitution. The Court will deny Defendant's Motion to Dismiss.

### A. Commerce Clause

■ In the Violent Crime Act of 1994, Congress added to the list of persons prohibited from possessing a firearm to include individuals subject to domestic violence restraining orders. Defendant's argument that § 922(g)(8) is an unconstitutional exercise of Congress' commerce power is based upon the decisions in *United States v. Morrison*, —— U.S. ——, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) and *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Both cases are distinguishable. In *Lopez*, the Supreme Court declared unconstitutional the Gun Free School Zones Act, 18 U.S.C. § 922(q), reasoning that the statute "by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms[,]" and contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession [within 1,000 feet of a school] affects interstate commerce." *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624. The *Lopez* decision does not support a finding of unconstitutionality for statutes which have express jurisdictional elements. Section 922(g)(8) expressly limits its application to firearms "in or affecting commerce," thus, it is constitutional under the *Lopez* analysis. *See United States v. Bostic*, 168 F.3d 718, 722–24 (4th Cir. 1999) (§ 922(g)(8) constitutional under the Commerce Clause and the Fifth and Tenth Amendments), *cert. denied*, 527 U.S. 1029, 119 S.Ct. 2383, 144 L.Ed.2d 785 (1999); *United States v. Cunningham*, 161 F.3d 1343, 1345–47 (11th Cir. 1998)(Court rejected a Commerce Clause challenge to § 922(g)(8), finding it constitutional on its face); *United States v. Wilson*, 159 F.3d 280, 284–89 (7th Cir. 1998)(§ 922(g)(8) constitutional under the Commerce Clause and the Fifth and Tenth Amendments), *cert. denied*, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 774 (1999); *United States v. Pierson*, 139 F.3d 501 (5th Cir.1998)(§ 922(g)(8) constitutional under the Commerce Clause), *cert. denied*, 525 U.S. 896, 119 S.Ct. 220, 142 L.Ed.2d 181 (1998).

Since *Lopez*, the Court of Appeals for the First Circuit has upheld, from Commerce Clause challenges, other statutes with jurisdictional elements. *See, e.g., United States v. Cardoza*, 129 F.3d 6, 10–13 (1st Cir.1997)(rejecting Commerce Clause challenge to the Youth Handgun Safety Act, 18 U.S.C. § 922(x) finding that supply and demand for handguns will "substantially affect" interstate commerce); *United States v. Bongiorno*, 106 F.3d 1027, 1033 (1st Cir.1997)(Child Support Recovery Act constitutional under the Commerce Clause finding it regulates payment obligations in interstate commerce). Setting aside the jurisdictional element, § 922(g)(8) is valid because it directly regulates commerce in firearms. The Supreme Court explained in *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974), that Congress enacted the federal gun laws because "it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." In enacting Title II of the Violence Against Women Act, Congress detailed the effects on interstate commerce as follows:

> Gender based crimes and the fear of gender based crimes, restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy.

S.R. 103–138 103d Congress, Pub.L. 103–322. Moreover, by making it a crime for persons to "ship or transport" and "possess" or "receive" guns, § 922(g) attacks the problem of firearms trafficking by such persons from both the supply side—shipping and transporting—and the demand side—possession and receipt.

Defendant claims that the Supreme Court's recent decision in *Morrison* extends *Lopez* and invalidates § 922(g)(8). In *Morrison* the Court ruled that the federal civil remedy of the Violence Against Women Act (VAWA), 42 U.S.C. § 13981(b), was unconstitutional. *Morrison*, —— U.S. at ——, 120 S.Ct. at 1754. The majority analyzed the statute's viability under the Commerce Clause in light of *Lopez*. The Court concluded that because the statute did regulate the use of channels of interstate commerce or protect or regulate instrumentalities of interstate commerce, the statute could be upheld only if it regulated an activity that substantially affects interstate commerce. The Court found that the non-economic nature of the regulated activity and the absence of any jurisdictional requirement in § 13981 were constitutional defects. The *Morrison* Court did not address the criminal VAWA statutes—18 U.S.C. §§ 2261, 2261A, and 2262—and the domestic violence related gun laws—18 U.S.C. §§ 922(g)(8) and 922(g)(9). The Court did, however, note with respect to the criminal VAWA statutes that all the courts of appeals have upheld the "criminal sanction as an appropriate exercise of Congress' Commerce Clause authority, reasoning that '[t]he provision properly falls within the first of *Lopez*'s categories as it regulates the use of channels of interstate commerce—*i.e.*, the use of the interstate transportation routes through which persons and goods move.'" *Id.* at 1752 n. 5 (quoting *United States v. Lankford*, 196 F.3d 563, 571–572 (5th Cir.1999) (collecting cases)).

Finally, the Court noted that like the statute invalidated in *Lopez*, § 13981 did not contain a jurisdictional element "establishing that the federal cause of action in pursuance of Congress' power to regulate interstate commerce." *Id.* 1751–52. By contrast to the statutes in *Lopez* and *Morrison*, § 922(g)(8) does contain a jurisdictional element and specifically regulates the possession of goods, *i.e.*, firearms, that have moved in interstate commerce. Because § 922(g)(8) has both a specific jurisdictional element as well as a substantial effect on interstate commerce, it is a constitutional exercise of Congress' power under the Commerce Clause.

### B. Due Process, Equal Protection, and Right to Counsel

Defendant claims, without argument or citation to supporting legal authority, that his rights to due process and equal protection and right to counsel under the Fifth, Sixth, and Fourteenth Amendments were violated because the Order for Protection was issued at a hearing which he did not attend and at which he was not represented by counsel.

■ The prohibitions of § 922(g)(8) apply only to orders that were issued after a hearing of which a defendant received actual notice and in which he had an opportunity to participate. Officer Morin served the temporary order on Defendant in hand on August 25, 1998. Government Ex. 1. Thus, Defendant was given actual notice of the hearing on the permanent order. Defendant apparently chose not to avail himself of the process by failing to appear and, thus, he cannot now claim that he was denied due process of law. Defendant does not articulate in either his Motion or his Memorandum of Law how the Equal Protection Clause or his right to counsel is implicated by the issuance of the Order for Protection. Failing to articulate any argument for a violation of these rights, the Court finds that Defendant has waived those claims. Moreover, the Court finds no evident basis for a violation of equal protection or the right to counsel.

### C. Tenth Amendment

■ Defendant mentions in his Motion to Dismiss, again without any articulated argument, that the Tenth Amendment's Residual Powers Clause provides a separate basis for striking down § 922(g)(8). The Court of Appeals for the First Circuit has upheld § 922(g)(8) on a Tenth Amendment challenge in *United States v. Meade,* 175 F.3d 215, 224–25 (1st Cir.1999). In addition, if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment. *See New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992);

*Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Meade,* 175 F.3d at 224.

■ What the Court can glean from Defendant's one-line Tenth Amendment challenge appears to be a contention that regulation of domestic relations is outside of Congress' competence. The Court disagrees. Congress has power under the Commerce Clause to regulate conduct that may seem purely local in nature. *See Bongiorno,* 106 F.3d at 1033. "Federal laws criminalizing conduct within traditional areas of state law, whether the states criminalize the same conduct or decline to criminalize it, are of course commonplace under the dual-sovereign concept and involve no infringement per se of states' sovereignty in the administration of their criminal laws." *United States v. Johnson,* 114 F.3d 476, 481 (4th Cir.1997).

## III. MOTION TO SUPPRESS

### A. Prearrest Statements

Defendant moves to suppress the statements he gave to the police on April 3, 2000, on the grounds that he was subject to custodial interrogation without the benefit of a *Miranda* warning. The Government concedes that no *Miranda* warnings were given and that Defendant was interrogated, but objects to the assertion that Defendant was in custody prior to his arrest.

■ The safeguards provided for by *Miranda* come into play only when a defendant is subjected to both custody and interrogation. *State of Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The determinative issue in the custody inquiry is "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal punctuation and quotation omitted). This fact-intensive inquiry, requiring consideration of the totality of the circumstances, is "how a reasonable man in the suspect's shoes would have understood his situation." *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Relevant circumstances include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Jones,* 187 F.3d 210, 217–18 (1st Cir.1999) (quoting *United States v. Masse,* 816 F.2d 805, 809 (1st Cir.1987)).

■ The Court begins its custody analysis at the apartment finding that prior to that point Defendant was not in custody. The first factor to consider when making a determination of custody is whether the surroundings are familiar or neutral and the degree of police control over the environment in which the interrogation took place. Defendant was in his own apartment at the time of the questioning, a familiar place indeed. A defendant's own apartment being the site of questioning generally counsels against a finding of custody; however, this is not always the case. *See United States v. Griffin,* 922 F.2d 1343, 1355 n. 15 (8th Cir.1990) ("It is the accepted logic that an interrogation in familiar surroundings such as one's own home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody. Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person cannot reasonably expect to be free anywhere if not within the refuge of his home.") (citation omitted). Despite the familiarity of the surroundings, here, Defendant was isolated from contact with anyone other than the officers, including his roommate—a possible source of moral support. The officers' direct restriction on the movement of Defendant and Palumbo transformed what would otherwise have been a neutral environment into one of absolute police control. The Court acknowledges that in this case, a carefully controlled environment was essential for the safety of the officers and occupants of the apartment during the search. Nevertheless, such control, albeit for legitimate purpose, may result in a finding that a suspect is in custody.

In this case, Cashman's command that Defendant stay in the kitchen was intended to, and did, dictate the course of Defendant's conduct even without physical contact. After the gun was secured, Bussiere's failure to tell Defendant that he was free to leave or that he did not need to answer questions contributed to a police-dominated environment. Additional support for the Court's finding of an atmosphere of custodial control is the number of officers in the small apartment. Although initially there were only three officers in the apartment (Bussiere with Defendant in the kitchen, Roberts with Palumbo in the living room, and Cashman searching), within a few minutes after entering the apartment, the number of officers increased to five.[1] Ultimately, after approximately one hour of questioning Defendant in the kitchen, the sixth officer, Bradeen, arrived with the arrest warrant and continued to question Defendant for

---

**1.** The testimony revealed that even before the gun was located, Detectives Chick and St. Pierre arrived at the apartment. Chick brought the consent form into the kitchen, read it to Defendant, and thereafter remained in the kitchen. Tr. at 50.

ten to fifteen minutes before arresting him. Tr. at 51. Five, and then six, police officers moving about this small apartment lends support to the Court's conclusion that a reasonable person would have felt that his freedom to move was curtailed. The overall circumstances did not allow Defendant to leave the kitchen or terminate the questioning.

The next factor the Court will consider is the character and duration of the interrogation. Prolonged, accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave. There is no evidence that the officers' questioning was threatening or coercive. To the contrary, Defendant's willing, almost eager, cooperation nullified the need for the officers to be abrasive or confrontational. The Court finds, however, the cordial nature of the questioning to be deceptive. The outwardly cooperative nature of the exchange does not displace the true inquiry regarding the character of the encounter. Although Defendant was previously told that he was not under arrest, he was never told that he was free to leave or that he could refuse to answer questions. The officers had told him that they were investigating a violation of a protective order resulting from his ownership of a firearm, Tr. at 44, and questioned Defendant about his acquisition, length of ownership, and use of the gun. Tr. at 89–90.

In addition, the length of time Defendant was questioned—over one hour—gives the Court some concern. In *United States v. Pratt*, 645 F.2d 89 (1st Cir.1981), the First Circuit cited a string of cases regarding the length of time that may lead to a conclusion of custody. *Id.* at 91. Of the cases cited, the only detention held to be custodial was for over an hour. *See United States v. Garcia*, 496 F.2d 670 (5th Cir.1974). In the present case, Defendant was interrogated for over one hour before being placed under formal arrest. The length of the questioning here far exceeded the few minutes necessary to keep Defendant occupied while the gun was secured. Particularly, after Bussiere radioed Bradeen and became aware that Bradeen was on his way to the apartment with an arrest warrant, Defendant was told that the officers were waiting for someone else to arrive, without indicating that Defendant did not have to wait or was free to leave. Tr. at 90. Finally, after Bradeen arrived he continued to question Defendant for ten to fifteen minutes before arresting him. Tr. at 51.

Finally, the Court considers the officers' use of physical restraint used on the Defendant. There was no testimony indicating that the officers ever came in direct bodily contact with Defendant or that he was physically restrained during the questioning in the kitchen to any degree beyond that of the controlled environment itself. Consideration of this element counsels in favor of finding that Defendant was not in custody at his apartment.

The Court finds that the proper characterization of Defendant's detention for purposes of *Miranda* is an extremely close question. However, the Court concludes that a reasonable person would have understood, from the restraint created by the police-controlled environment and the length and nature of the interrogation, that he was in custody. Thus, the statements Defendant made, after he was told by Cashman to go into the kitchen, are a result of the custodial interrogation without the benefit of a *Miranda* warning and must be suppressed. At the hearing, Bradeen testified to a number of specific statements Defendant made in response to his questions, including Defendant's statement that he had lost his copy of the protective order. Bradeen having arrived after Defendant was in custody, any statements made in Bradeen's presence must be suppressed. Defendant testified that he was questioned in the kitchen regarding his acquisition, length of ownership, and use of the gun. Tr. at 90. Other than these statements, the Government presented no testimony regarding statements Defendant

made while in the kitchen. If, however, Defendant made any statements to Bussiere, Cashman, Roberts, Chick, or St. Pierre while in the kitchen those statements must also be suppressed.

### B. Tangible Evidence

Defendant also argues that the items taken from his apartment—the gun, the magazines, and the protective order—were illegally seized because the officers did not have a search warrant and his consent was not valid, having been obtained while he was in custody without the benefit of a *Miranda* warning. The Government disagrees, responding that the evidence seized is admissible because Defendant voluntarily turned over the gun and consented to the search.

 The police may conduct a warrantless search when a suspect voluntarily consents to it. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Esquilin*, 208 F.3d 315, 318 (1st Cir.2000). Voluntariness is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041. The Government bears the burden of proving that the consent was not the product of coercion. *Id.* at 221–22, 93 S.Ct. 2041. Relevant factors include the defendant's knowledge of his constitutional right to refuse to consent, the defendant's age, vulnerability, intelligence, education, the degree to which he cooperated with the police, and the use of punishment or other coercive behavior. *Id.* at 226, 93 S.Ct. 2041; *United States v. Barnett*, 989 F.2d 546, 554–55 (1st Cir.1993). In this case, Defendant is a thirty-five-year-old instructor in the National Guard. He was eager to cooperate with the officers and consented to the search even after being informed by Bussiere that he did not have to turn over the gun. As found above, the officers never applied any physical force to Defen-

dant and his cooperation obviated the need for any form of coercion. The Court finds, therefore, that his consent to search the apartment was voluntary and the tangible evidence obtained as a result thereof is admissible.[2]

Accordingly, the Court **ORDERS** that Defendant's Motion to Dismiss be, and it is hereby, **DENIED**. The Court further **ORDERS** that Defendant's Motion to Suppress be, and it is hereby, **GRANTED** with respect to the prearrest statements Defendant made once he was in the kitchen and **DENIED** with respect to the tangible evidence seized at the apartment.

---

2. The Court's finding that Defendant voluntarily consented to the search prior to being subject to custodial interrogation obviates the need to address his argument that the con-

sent, having been obtained while he was in custody without the benefit of a *Miranda* warning, was not valid.