2003 ME 103

**STATE of Maine**

v.

**Katrina BRIDGES.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2003.
Decided: Aug. 6, 2003.

G. Steven Rowe, AG, Donald W. Macomber, AAG (orally), Augusta, for the State.

David J. Mitchell, (orally), Mitchell & Mitchell, Calais, Jeffrey Toothaker, Toothaker & Chong, Ellsworth, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Katrina Bridges appeals a judgment of conviction for murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983),[1] entered in the Superior Court (Washington County, *Gorman, J.*) following a jury trial. Katrina contends that the trial court (1) improperly denied her motion to suppress certain incriminating statements she made to law enforcement officers; (2) improperly disallowed her attempts to present alternative perpetrator evidence, and refused to give an alternative perpetrator jury instruction; and (3) erred in allowing the State to present prejudicial evidence of her prior bad acts in conjunction with prior statements made by the victim. We are persuaded by Katrina's contentions that she was subject to custodial interrogation during a third interview by the police on January 3, 2001, without *Miranda* warnings, and that the Superior Court erred in denying her motion to suppress certain of her incriminating statements. Because this error is not harmless, we vacate the judgment.

[¶ 2] In January of 2001, Katrina, then twenty years old, was living with the victim, Chris Ingraham, in Jonesboro. The couple met in New York around late 1999 or early 2000, and began living with Chris's parents in New York. During their stay, a large sum of Chris's parents' money was discovered to be missing. Chris and Katrina moved to Maine shortly thereafter.

[¶ 3] The couple's relationship began to deteriorate. Chris worked at the Commissary in Cutler, and he told various co-workers that Katrina needed counseling because, Chris believed, she had stolen money from his parents, and also from her own grandmother. Chris told them that if Katrina did not get help, he intended to leave her and return to New York with Logan, the couple's four-month-old son.

[¶ 4] On the morning of January 2, 2001, a Columbia Falls woman, whom Katrina knew, discovered that her Sears and Roebuck twelve-gauge shotgun with a cracked stock, and Remington Model Nylon 66 .22 rifle with a scope and a broken screw, were stolen from her gun cabinet. Later that morning, Katrina went to Main Street Discount in Machias and pawned sixteen PlayStation games. She told the owner that she had already sold a .22 rifle to another pawnbroker in East Machias. Katrina also indicated to the owner that she

---

1. Title 17–A M.R.S.A. § 201(1)(A) provides:

    1. A person is guilty of murder if:

        A. He intentionally or knowingly causes the death of another human being.

had a shotgun to sell, but Katrina did not show it to the owner, despite his desire to see it.

[¶ 5] Katrina subsequently called Chris at work and told him that their home had been burglarized. Katrina told Chris that among the items taken were a shotgun given to Chris by his parents, several PlayStation games, and some of Katrina's jewelry. Katrina never reported a burglary to the police.

[¶ 6] Around 4:45 A.M. on the morning of January 3rd, a gas station security camera captured Katrina purchasing gas and a drink with cash. The attendant watched Katrina drive up in a dark colored Nissan Pathfinder, accompanied only by her baby in the back seat. At 12:30 P.M. on that same day, Katrina showed up with the baby at the home of her mother, Ellen Bridges, in a highly emotional state. Ellen did not see Katrina approach the house, but, when she opened the door, she noticed that Katrina was not wearing shoes, her face was swollen, and her lips were red. Katrina told Ellen that she was concerned for Chris, and, thinking that Katrina and the baby might be in danger, Ellen drove them to the Machias fire station building, which is attached to the Machias Police Department.

[¶ 7] When they arrived at 12:45 P.M., Katrina and the baby were led into one of two empty bedrooms. The 10 × 12 bedroom had one blind-covered window, and contained a bed and bureau. There were two exits from the bedroom: one led through an adjoining bathroom, while the other opened directly into the hallway. Katrina's feet were covered with blankets.

[¶ 8] Trooper Paul White arrived on the scene at approximately 1:02 P.M., entered the bedroom and, with the doors closed, began to ask Katrina what happened. Katrina, while sitting on the bed, remained in an emotional state and cried throughout the interview. She told Trooper White that she had been the victim of a kidnapping. Katrina also claimed that two men forced their way into her home, shot Chris, and kidnapped her and the baby. Ellen continued to come in and out of the bedroom while Trooper White interviewed Katrina. The first interview lasted until Detective Stanley Jandreau arrived between 1:30 and 2:00 P.M.

[¶ 9] Detective Jandreau conducted a second interview of Katrina in the same bedroom from approximately 2:25 to 3:43 P.M.[2] Katrina remained extremely upset throughout the duration of her conversation with Detective Jandreau, but, during this interview, she told a more detailed story. She indicated that, at 3:00 A.M. on the morning of January 3, two Canadian men drove into Katrina's and Chris's driveway in a light colored Jeep Cherokee, forced their way into the home, and demanded to see Chris because he owed them money. According to Katrina, one of the men took a shotgun from a gun rack in the home and forced her and the baby into Katrina's Nissan Pathfinder. As she was led away from her home, Katrina heard a gunshot. She said the unknown individual drove her and the baby around until noon, and let them off in Whitneyville. At the conclusion of the second interview, the police began to search for Katrina's Pathfinder and for the Canadian men.

[¶ 10] Between 1:00 and 1:20 P.M., the police found Chris lying naked on the bed in the bedroom at Chris and Katrina's residence on Look Point Road in Jonesboro. Chris's hand and left foot were

---

2. Law enforcement authorities did not allow Ellen to enter the room after about 2:15 P.M. Although Ellen subsequently requested to see her daughter several times, an officer denied her entry each time. As a result, Ellen left the fire station with the baby at 4:30 P.M.

partially covered by a blanket, and there was dried vomit and blood around his mouth and face. Chris was breathing, but he was unconscious and unresponsive. Chris was transported by ambulance to the hospital in Machias where a CAT scan revealed that he had a small-caliber bullet lodged in his brain.

[¶ 11] After the first interview, Trooper White drove to Flats Road in Marshfield and found Katrina's Nissan Pathfinder with a loaded shotgun in the back.[3] Detective Brian Smith then spoke with Raymond Getchell, Katrina's great uncle, who owned the woodlot where Katrina's Pathfinder was found. Getchell said that he left his woodlot at 11:30 A.M. for lunch and returned at around 12:30 P.M. to find the Pathfinder. As he approached, Getchell saw Katrina exit the driver's side of the Pathfinder and start walking toward him with the baby in her arms. Katrina told him that her vehicle broke down and that she needed a ride to her mother's. He drove her to Ellen Bridges's house, but as he approached the residence, Katrina asked him not to drive all the way into the driveway. Katrina got out of the vehicle with the baby, and walked toward the residence.

[¶ 12] Detective Smith arrived at the fire station at 4:10 P.M; he knew that both Trooper White and Detective Jandreau had already interviewed Katrina.[4] After noticing some inconsistencies between the evidence found at the crime scene and Katrina's initial statement to Detective Jandreau, Detectives Jandreau and Smith decided to initiate and tape-record a third interview. The detectives commenced the third interview of Katrina in the fire station bedroom at approximately 4:34 P.M.[5] Katrina remained very emotional, and continued to sit on the bed without shoes while the doors were closed and the shade to the window remained down. Katrina was told she was free to leave before the interrogation began, but the detectives did not read the *Miranda* warnings to her.

[¶ 13] At the outset of the third interview, Detective Smith asked Katrina to again recount the events of the day in detail. While she did so, Detective Smith repeatedly expressed his belief to her that she was not being truthful and told her that he did not believe her version of how she was dropped off at Getchell's woodlot. In response, Katrina asked to speak to Getchell, her great uncle, three different times, but Detective Smith denied all of her requests. Detective Smith also told Katrina that he saw her footprints in the snow near her house, though he never actually looked for footprints. Detective Jandreau explicitly instructed Katrina to stay seated on the bed and to tell the truth.

[¶ 14] During this first portion of the third interview, Katrina indicated that she was not feeling well. Detective Smith nonetheless persisted and told her that they would take her socks and match them up to prints found at the crime scene. Detective Jandreau also told Katrina that they had no doubt that she was more involved than she claimed. Katrina then began to alter her story; she claimed that the Canadians arrived at her house demanding that she perform certain sexual

---

3. This was the shotgun given to Chris by his parents, as distinguished from the one later found at Chris and Katrina's residence.

4. Detective Smith also was aware that Katrina claimed she had been awake since approximately 2:00 A.M.

5. Both officers wore plain clothes during the interview.

acts, and, when she refused, they raped Chris. Detective Jandreau retorted, saying that the Canadians were not responsible for Chris's death. The first portion of the third interview concluded at 5:58 P.M., when the detectives left Katrina alone to "be thinking about the truth." They asked for and received Katrina's permission to ask her more questions.[6]

[¶ 15] The third interview resumed at 6:24 P.M., when Detective Smith was joined by Dale Keegan, a polygraph examiner and trained interviewer, who had driven from Caribou to help conduct the interview. Detective Smith again confronted Katrina, telling her that it was she, not one of the Canadian men, who drove the Pathfinder onto Getchell's woodlot. He told her that the police found an eyewitness to prove it. Katrina demanded to speak with this eyewitness, but Detective Smith denied her request, stating: "[n]o ... [y]ou're not gonna talk to any of these people." The detectives took turns speaking to Katrina; Detective Smith would speak more harshly to Katrina, and Detective Keegan would offer Katrina suggestive explanations for her involvement in Chris's shooting.

[¶ 16] Finally, Detective Keegan removed his business card, showed it to Katrina, and informed her that he was both a polygraph examiner and a detective, but that he needed neither of those skills to know she was lying. Katrina then further altered her story. Eventually, Detective Keegan suggested to Katrina that perhaps she and Chris were attempting to carry out a murder-suicide pact. Katrina answered "yeah," but claimed that Chris shot himself. She then changed her story again, claiming that Chris put her finger around the trigger and helped her fire it.

The detectives continued to push her; Detective Smith suggested that she killed Chris because he abused her. Katrina responded by saying that she put the gun to his head and pulled the trigger thinking the safety was on. When Katrina then said she could show the detectives where the weapon was thrown, the interview concluded at 8:52 P.M. The third interview lasted three hours and fifty-two minutes.

[¶ 17] Around 9:30 P.M., the detectives and Katrina left the fire station to attempt to locate the weapon used to shoot Chris, but did not find it. They then unsuccessfully attempted to locate a child safety seat that Katrina claimed had been thrown out of her Pathfinder. Katrina was arrested at 10:44 P.M.

[¶ 18] Chris Ingraham was pronounced dead at 2:37 A.M. on January 4th. That same day, the police recovered a spent shell casing, several live .22 cartridges, and a Sears and Roebuck shotgun from the bedroom where Chris was found.[7] The next day, police recovered eighteen .22 bullets in Katrina's Pathfinder. A brown Remington Model Nylon 66 .22 with a scope was also found lying in the snow along Route 182, next to a box of .22 shells. A police firearms specialist subsequently determined that one of three fingerprints lifted from the Remington rifle belonged to Katrina. Three of Katrina's fingerprints were found on the Sears and Roebuck twelve-gauge shotgun.

[¶ 19] Katrina was indicted for murder on January 18, 2001. Katrina moved to suppress the statements she made during the third interview on January 3rd, arguing the statements were obtained in violation of her rights as articulated in *Mi-*

---

6. Detective Jandreau had no further involvement with the third interview.

7. This was identified as one of the guns taken from the Columbia Falls home on January 2nd.

*randa v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following a hearing, the motion court (*Humphrey, J.*) denied the motion, concluding that Katrina was not in "custody" for the purposes of *Miranda*. The motion court analyzed the custody issue as follows:

It is the third interview that began with Detectives Smith and Jandreau and concluded with Smith and Keegan that requires further scrutiny. Although the detectives confronted and challenged the defendant several times concerning the credibility of her statements and repeatedly exhorted her to tell the truth, their demeanor and the tenor of the entire interview was non-aggressive. The detectives were dressed in civilian clothes and their weapons were concealed. They did not raise their voices to the defendant at any time. They told her that she did not have to talk to them and could leave any time she wanted. They extended several offers to the defendant of food, drink and aspirin.... Viewing the totality of the circumstances of this interview, it cannot be said that a reasonable person in the defendant's position would have believed she was in police custody or constrained to the degree associated with formal arrest.

(Internal citations omitted.)

[¶ 20] Katrina's jury trial took place in September of 2001. Chris's co-workers testified about conversations they had with Chris, prior to his death, concerning the nature of his relationship with Katrina. They were specifically permitted to testify that Chris told them that Katrina had stolen money from Chris's family and from her own grandmother, and that Chris intended to leave Katrina if she did not agree to seek counseling.[8]

[¶ 21] Katrina sought to present certain alternative perpetrator evidence from Sherry Jenkins, who was prepared to testify about a prior incident with Wayne Jones. According to Jenkins, Jones was a known drug dealer who came to her home on December 27, 2000, driving a gray Jeep. Jones entered her home uninvited and forced her brother, Bernard Metcalf, to leave with him.[9] The court ruled:

Under 404(b), [Jenkins] will not be allowed to testify as to the events that occurred at her house. She'll be allowed to testify as to the existence of Mr. Jones, to what he looks like, what he sounds like, what he drives for a vehicle, and whether he was at her home sometime around—sometime between Christmas and New Year's in the year 2000. But, the only way that what [Mr. Jones] did [on the particular occasion] could be relevant to this case is to try to show that he acted like that again on January 2nd or 3rd when he is claimed to have been at [Katrina and Chris's house].

Katrina requested an alternative perpetrator jury instruction, which the court denied. The jury returned a guilty verdict, and Katrina was sentenced to a prison

---

8. Katrina objected to the admission of those statements, but did not suggest at trial that the statements could be partially redacted to eliminate the specific references to Katrina's theft of money to limit their prejudicial effect. This issue is not dispositive of Katrina's appeal; it is more appropriate for the trial court to address the issue at retrial.

9. Katrina referred to Jones, a known drug trafficker in Washington County, in the first interview as one of the Canadian men who entered her house. The police acquired a photograph of Jones, who fit Katrina's description. Jenkins had told Katrina about Jones visiting her home, but she did not remember describing Jones to Katrina. Jones stayed at the Machias Motor Inn on December 26, and was seen driving a gray-colored Jeep Cherokee.

term of forty-five years. Katrina filed this appeal.

## II.

[¶ 22] In seeking to suppress her statements, Katrina asserts that she was in custody for the purposes of *Miranda* during the third interview. She contends that being in a small bedroom with closed blinds and doors during questioning, for several hours, despite being told that she could leave, deprived her freedom of movement to the degree associated with formal arrest. We agree.

[¶ 23] A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in order for statements made during the interrogation to be admissible against her as part of the State's direct case at trial. *State v. Hewes*, 558 A.2d 696, 698 (Me.1989) (citing *State v. Jalbert*, 537 A.2d 593, 594 (Me.1988)). Failure to administer *Miranda* warnings renders any resulting statements inadmissible. *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, *or was not subject to interrogation. See State v. Barczak*, 562 A.2d 140, 144 (Me. 1989).

[¶ 24] Rulings on motions to suppress are reviewed for errors of law or clearly erroneous findings of fact. *State v. Anderson*, 1999 ME 18, ¶ 6, 724 A.2d 1231, 1233. We will uphold the denial of a motion to suppress "if any reasonable view of the evidence supports the trial court's decision." *State v. O'Rourke*, 2001 ME 163, ¶ 12, 792 A.2d 262, 265.

[¶ 25] The determination of whether an individual was in custody is a mixed question of fact and law. *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). We give deference to the trial court's factual determinations, but the determination of whether an individual was in custody requires an independent *de novo* review. *Id.*

[¶ 26] In determining whether an individual was in custody, the test is whether a reasonable person, standing in the defendant's shoes, would "have felt he or she was not at liberty to terminate the interrogation and leave," *id.* at 112, or stated differently, whether there was a "restraint on freedom of movement" to the degree associated with formal arrest, *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation omitted); *State v. Michaud*, 1998 ME 251, ¶¶ 3–4, 724 A.2d 1222, 1226. This determination is an objective one, *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994),[10] and a number of factors are considered:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

---

10. As the *Stansbury* Court noted, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. at 323, 114 S.Ct. 1526.

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. Higgins,* 2002 ME 77, ¶ 13, 796 A.2d 50, 54–55 (quoting *Michaud,* 1998 ME 251, ¶ 4, 724 A.2d at 1226); *see State v. Holloway,* 2000 ME 172, ¶ 19, 760 A.2d 223, 229 ("These factors are not to be viewed in isolation, but rather in their totality.").

[¶ 27] The State emphasizes that the questioning did not occur at the police station. Although Katrina's questioning took place at a fire station, the fire station was attached to the police station. More importantly, the room was the functional equivalent of a police interrogation room in that it was a small, 10 × 12 bedroom with one blind-covered window and two exits, both doors to which were closed. *See Miranda,* 384 U.S. at 477, 86 S.Ct. 1602 (observing that interrogation is custodial if it occurs while an individual is "in custody at the station *or otherwise deprived of his freedom of action in any significant way* ") (emphasis added). The State also notes that Katrina's mother brought Katrina to the fire station. A suspect's initiation of an interview is suggestive of a non-custodial environment, *see Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711,

50 L.Ed.2d 714 (1977), but Katrina's mother, an EMT, drove to the fire station because of her own, and not Katrina's, familiarity with it. Moreover, Trooper White made the initial contact with Katrina at the station by entering the bedroom to begin questioning her. *See Holloway,* 2000 ME 172, ¶ 20, 760 A.2d at 230. Accordingly, it cannot be said that Katrina initiated the contact with authorities in a familiar surrounding.

[¶ 28] The motion court relied, in part, on the detectives' statements to Katrina that she was free to leave. Although a statement that one is free to leave is important, *see State v. Graves,* 638 A.2d 734, 737 (Me.1994), it is not by itself dispositive, *see State v. Preston,* 411 A.2d 402, 405–06 (Me.1980) (finding defendant was in custody despite statements by the authorities that defendant was free to leave). The detectives did not preface their statement with *Miranda* warnings, *see Hewes,* 558 A.2d at 697 (suggesting detective failed to give *Miranda* warnings before advising defendant he was free to leave because detective "was concerned that [defendant] would be less likely to make an inculpatory statement"), and they repeatedly accused her of lying, and told her she had more involvement in the case than she claimed, *see Preston,* 411 A.2d at 406 ("By suggesting to defendants that the police had cause to arrest them even though they were not going to do so at that time, [the officer] increased the potential for creating the coercive atmosphere which triggers the requirement of the *Miranda* warnings."). The detectives likewise told Katrina that they would not look for alternative suspects based solely on her word. *Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual

being questioned.").[11]

[¶ 29] Throughout the third interview, the detectives also made false or misleading statements about evidence they purportedly uncovered, and took advantage of Katrina's feelings toward her young child by encouraging her to "remember Logan" and tell the truth. *Cf. United States v. Beraun–Panez*, 830 F.2d 127 (9th Cir.1987) (affirming suppression of defendant's statements when the police confronted defendant with false witness statements, good guy/bad guy tactics, and insecurities about his alien status).

[¶ 30] From near the beginning of the third interview, Katrina indicated a belief that she was the prime suspect, *see Stansbury*, 511 U.S. at 325–26, 114 S.Ct. 1526; she specifically reacted to the detectives various accusations by stating, "I'm glad you guys think I'm the murderer now," *see Higgins*, 2002 ME 77, ¶ 13, 796 A.2d at 54–55 (noting suspect's subjective views are important to the extent that the officer's response affects how a reasonable person would perceive his or her freedom to leave). In a representative dialogue, Detective Jandreau stated:

> You wanted to get rid of Chris, but I think he's somewhat controlling. And you didn't know how to get around it, or what to do. Finally, you get to the point, where you can't take it anymore. You're very stressed. This happens to Chris, at three o'clock in the morning. You take your baby, and your two dogs, not just one, but two. You get in your Pathfinder, and you drive around. And you drive around until you find Ray Getchell's woodlot, and you park there until Ray Getchell drives in. And, when he does, you hop out, and flag him down, and have him bring you to your mom's.

And then you tell us the story you tell us, but it doesn't make sense. Okay, Katrina? So, what we need is the truth. All right?

This close and persistent line of interrogation, which involved leading questions and challenged Katrina's denials of involvement, strongly suggests that Katrina could not help but believe she was in custody. *See* LAFAVE, ISRAEL, & KING, CRIMINAL PROCEDURE § 6.6(f) (3d ed.2000) (hereinafter LAFAVE at § 6.6(f)).

[¶ 31] The Superior Court found that the demeanor of the interviewing detectives was non-aggressive. A showing of aggressive behavior by interviewing detectives, however, is not a necessary prerequisite to a finding of custody. *See United States v. Bunnell*, 106 F.Supp.2d 60, 68 (D.Me.2000) (observing that cordial questioning by officers often serves as an attempt to disguise the true character of an encounter); *see also Proctor v. United States*, 404 F.2d 819, 821 (D.C.Cir.1968) ("Even innocent questions asked of a suspect in the inherently coercive atmosphere of the police station may create in him the impression that he must answer them."). Although the detectives "told her she did not have to talk to them" and "extended several offers to the defendant of food, drink, and aspirin," *cf. People v. Ellingsen*, 258 Cal.App.2d 535, 65 Cal.Rptr. 744, 748 (1968) (noting officers who supplied food to the defendant during interrogation suggested defendant was not free to obtain food on his own), the detectives refused Katrina's several and unequivocal requests to speak to Getchell, *see United States v. Thomas*, 190 F.Supp.2d 49, 61 (D.Me.2002) (observing that officers' restriction of a defendant's movement transformed a neu-

---

11. The officer's beliefs are relevant to the extent that they would affect how a reasonable person in the defendant's position "would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526 (citation omitted).

tral environment into one of "police control").

[¶ 32] Moreover, Detective Jandreau unambiguously told Katrina that she "need[ed] to sit there ... and tell the truth." *Cf. United States v. Kruger,* 151 F.Supp.2d 86, 98 (D.Me.2001) ("The degree of control exerted by the officers had increased in intensity throughout the evening, and the intensity of their asserted control was rapidly escalating[.]"). At that point, Katrina had already endured questioning from four different detectives throughout three lengthy interviews in a small room during which she became the detectives' prime suspect; she had been awake since 2:00 A.M.; she told the detectives on more than one occasion that she was not feeling well; she was emotional throughout each interview; she was separated from her child; she was without shoes; and she had no means of transportation. *See Bunnell,* 106 F.Supp.2d at 68 ("Prolonged, accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave."); LAFAVE at § 6.6(f) ("A court is more likely to find the situation custodial when the suspect was confronted by several officers instead of just one, when the demeanor of the officer was antagonistic rather than friendly, and when the questioning was lengthy rather than brief and routine.").

[¶ 33] Although Katrina was not physically restrained while in the Machias Fire Department, the fire station bedroom was hidden from public view, which served to isolate Katrina from the outside world. *See Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[E]xposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate,

he will be subjected to abuse."). After the police, on a number of occasions, would not allow Katrina's mother to enter the bedroom to see Katrina, the mother left the station with Katrina's baby. *Miranda,* 384 U.S. at 455, 86 S.Ct. 1602 ("To be alone with the subject is essential to prevent distraction and to deprive him of any outside support."). Isolating a subject from others, who might lend moral support to the person in question, can be a technique of psychological coercion. *Id.* at 449–50, 86 S.Ct. 1602.

[¶ 34] In defending the motion court's denial of Katrina's motion to suppress, the State places great reliance on *State v. Higgins,* 2002 ME 77, 796 A.2d 50, contending that our opinion in that case supports the motion court's conclusion that Katrina was not in custody. Substantial differences exist, however, between these facts and those present in *Higgins.* In *Higgins,* we upheld the motion court's conclusion that the defendant was not in custody for *Miranda* purposes by relying, in part, on *Higgins's* voluntary participation in two initial interviews with the police. *Id.* ¶ 4, 796 A.2d at 52. *Higgins* also agreed to provide a blood sample for DNA testing, and, when asked to submit to another interview, he not only agreed, but also left work and drove himself to the interview. *Id.* ¶¶ 4–5, 796 A.2d at 52–53. *Higgins* was questioned in a large, wide-open room, the door to which was open throughout the approximately three-hour interview. *Id.* ¶¶ 6–7, 796 A.2d at 53. He never attempted to leave and even acknowledged that, "he knew how the legal system worked and that he was trying to help the detectives." *Id.* ¶ 7.

[¶ 35] Unlike *Higgins,* Katrina expressed no knowledge of the legal system, and did not volunteer to provide a blood sample. Katrina did not drive herself to the fire station and, after her mother left, did not possess an independent means of transpor-

tation to leave the fire station. She had no vehicle, and was without shoes on a cold day in early January. Unlike the interrogation room in *Higgins,* the fire station bedroom where authorities interrogated Katrina was small and the doors to the room remained closed. Katrina was separated from her mother and from her infant son. She likewise made several requests to speak with her uncle, which were ignored or denied. Finally, unlike the single three-hour interview of Higgins, Katrina endured three interviews in the same room on the same day that, together, lasted nearly six hours. *Higgins* does not control the disposition of this case.

[¶ 36] Viewing the totality of the circumstances, we conclude that a reasonable person in Katrina's circumstances would have felt that she was not free to terminate the interrogation and leave the fire station. As such, Katrina should have received her *Miranda* rights. "[T]he effectiveness of law enforcement is not undermined by informing suspects of their rights." *United States v. Griffin,* 922 F.2d 1343, 1356 (8th Cir.1990), *cited with approval in Holloway,* 2000 ME 172, ¶ 23, 760 A.2d at 231. Indeed, the detectives should have known that they were engaged in a custodial interrogation.

[¶ 37] The failure to suppress Katrina's statements was not harmless error. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The State relied heavily on the statements Katrina made during the third interview and played the entire interview tape for the jury at trial. Each juror was given a copy of the interview transcript for use in following along with the tape. Those interview statements directly contradicted her defense that there was an alternative perpetrator. Accordingly, we cannot say that the admission of Katrina's incrimina-

ting statements was harmless beyond a reasonable doubt.

## III.

[¶ 38] Katrina also contends that the Superior Court abused its discretion by disallowing her the opportunity to fully present her alternative perpetrator evidence. She argues that Sherry Jenkins should have been allowed to testify about what Jones did to Jenkins's brother, Bernard Metcalf, to bolster Katrina's claim that Jones entered her house and dealt with both her and Chris in a similar manner.

[¶ 39] We review a trial court's decision to exclude or admit evidence for an abuse of discretion or clear error. *State v. Willette,* 2002 ME 165, ¶ 11, 809 A.2d 617, 621. Generally, a criminal defendant may present evidence to support her contention that another is responsible for the crime with which she is charged. *State v. Dechaine,* 572 A.2d 130, 134 (Me. 1990). Indeed, a trial court must admit such evidence "if it is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability." *Id.* (internal quotation omitted). The defendant must reasonably establish the connection between the alternative perpetrator and the crime through *admissible evidence. Id.* ("Without such evidence, a defendant cannot be allowed to use [her] trial to conduct an investigation that [she] hopes will convert what amounts to speculation into a connection between the other person and the crime.").

[¶ 40] Katrina proffered the testimony of Sherry Jenkins that Jones arrived in a gray Jeep Cherokee at Jenkins house and forcibly removed Metcalf from the residence, kept him overnight, and returned him the next day. Although it could be argued that her testimony has *some* relevance, its admission would contravene

M.R. Evid. 404(b). The court did allow Jenkins to describe what Jones looked like, what he sounded like, what vehicle he drove, and whether he was at Jenkins's home somewhere around Christmas of 2000. The court did *not* allow Jenkins to testify about what Jones did to her brother because, as the court accurately concluded, "the only way that ... could be [sufficiently] relevant [to be admissible] ... is to try to show that he acted like that again ... when he is claimed to have been at the Katrina–Ingraham household."

[¶ 41] In *State v. Robbins*, 666 A.2d 85, 87 (Me.1995), we affirmed Robbins's conviction for public indecency and, in doing so, affirmed the trial court's exclusion from evidence of an alternative suspect's criminal record, which detailed two convictions of public indecency. We relied in part on rule 404(b)[12] to conclude that such evidence, if admitted, would improperly have allowed the jury to infer that, because the alternative suspect had a prior conviction for public indecency, he must be responsible for the same crime on this occasion. *Id.*

[¶ 42] In this case, Jenkins's testimony was properly limited. Like the proposed evidence offered in *Robbins*, Jenkins's excluded testimony would have described a specific instance of Jones's conduct, which is similar to what Katrina claimed happened to her. Pursuant to M.R. Evid. 404(b), the evidence detailing Jones's prior conduct was inadmissible because the rule does not allow evidence of other crimes or wrongs to prove that a person had a propensity for such crimes. *E.g., State v. DeMass*, 2000 ME 4, ¶ 16, 743 A.2d 233, 237.

## IV.

[¶ 43] Finally, Katrina contends that the Superior Court erred in refusing to give an alternative perpetrator jury instruction. As a rule, a trial court must instruct the jury on a defendant's theory of the case either when (1) that theory involves a defense generated by the evidence and that must be disproved by the State, *e.g., State v. Case*, 672 A.2d 586, 589–90 (Me.1996), or (2) when that theory involves a lesser included offense rationally supported by the evidence, *see State v. Carmichael*, 405 A.2d 732, 736–37 (Me. 1979). A trial court, however, need not instruct the jury on a defendant's *theory* of the case when that theory represents a method for generating reasonable doubt. *State v. Hernandez*, 1998 ME 73, ¶ 7, 708 A.2d 1022, 1025; *see* Alexander, *Maine Jury Instruction Manual* § 6–7 cmt. (4th ed.2003).

[¶ 44] In this case, Katrina presented some evidence to suggest the possibility that an alternative suspect, namely Wayne Jones, could have murdered Chris Ingraham. Katrina was free to argue, and she did argue to the jury, that such evidence created a reasonable doubt as to her own guilt. As we noted in *Hernandez*, jury instructions "are intended to 'state the law which is relevant and applicable to the particular facts in controversy,' ... *not to highlight a party's argument.*" *Hernandez*, 1998 ME 73, ¶ 7, 708 A.2d at 1025. (internal citations omitted) (emphasis added). The Superior Court properly instructed the jury on the State's burden to prove each element of the crime, and cor-

---

12. M.R. Evid. 404(b), for example, disallows "[e]vidence of other crimes, wrongs ... to prove the character of a person in order to show that the person acted in conformity therewith." The Advisers' Note, however, provides that 404(b) "does not exclude the evidence when offered for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M.R. Evid. 404(b) advisers' note.

rectly defined reasonable doubt. The court was not required to do more. *See id.*

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.