2007 ME 77

**STATE of Maine**

v.

**Hamza HASSAN.**

Supreme Judicial Court of Maine.

Submitted On Briefs: March 29, 2007.

Decided: June 28, 2007.

Stephanie Anderson, District Attorney, Julia A. Sheridan, Asst. Dist. Attorney, Portland, for State.

Kevin R. Heffernan, Esq., Brookline, MA, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

CLIFFORD, J.

[¶ 1] Hamza Hassan appeals from a judgment of conviction for terrorizing (Class D), 17–A M.R.S. § 210(1)(A) (2006), entered in the Superior Court (Cumberland County, *Cole, J.*), following the entry of a conditional guilty plea pursuant to M.R.Crim. P. 11(a)(12). Hassan contends that the Superior Court erred in denying his motion to suppress statements he made to the police. We agree with Hassan that his interrogation at the Portland Police Department was, at least in part, a custodial interrogation, and because no warnings were given to Hassan pursuant to *Miranda v. Arizona,* 384 U.S. 436, 473, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court improperly denied his motion to suppress those statements. Accordingly, we vacate his conviction and remand for further proceedings.

## I. BACKGROUND

[¶ 2] The significant facts in this case are not disputed. At approximately 1:13 P.M. on December 15, 2005, three uniformed police officers were dispatched to 31 Springbrook Way in Portland after a bomb threat that had been received by Portland High School was traced to a telephone number at that address. Only Hassan, a nineteen-year-old Somali immigrant, and his grandmother, who does not speak English, were at the house when the officers arrived. Hassan stated that he was at home with his grandmother at the time the officers told him the bomb threat had been called in, and gave a written statement to the officers.

[¶ 3] Hassan also told the officers that he was willing to go to the Portland police station to talk to a detective. Hassan was permitted to change his clothing and was then transported to the police station, over eight miles away from his home, in the back of a police cruiser.

[¶ 4] At the station, Hassan was brought to a small windowless room on the fourth floor of the building. A detective questioned him and recorded the entire interview on videotape. At the beginning of the interview, in response to the detective's question, Hassan stated that he felt free to leave. Hassan also informed the detective that he was on probation for a juvenile offense.

[¶ 5] During the course of the interview, Hassan repeatedly denied calling the school, but did indicate that his sister had called the school to inform them that she was sick and would not be attending classes. After Hassan's repeated denials, the detective told him to "stop bullshitting," and further said that the bomb threat call had been recorded and that he had Hassan's voice on tape, even though the detective knew that no such recording

existed. Hassan asked if he could hear the recording, and the detective stated that he could, but that copies were being made and it would take time. The detective told Hassan to "step up," that he was not going to leave, and that the whole thing was not going to go away. Hassan stated that his juvenile probation officer was not going to believe him, and the detective told him that the probation officer had nothing to do with this case. Hassan said that he was afraid to admit to calling in the bomb threat, and the detective responded, "evidence is evidence." The officer asked Hassan if he was a man or a coward. Hassan stated that he did not want to be a man and take another person's blame, at which point the officer said that he was not asking Hassan *if* he did it, and further stated, "all the evidence clearly indicates you did." The detective again told Hassan that the phones at Portland High School not only trap the phone number of incoming calls, but also record the call. Hassan then stated to the officer, "if I leave the office right now, I'm going to jail" and the detective said, "I don't know that. Uniformed officers make that decision." Hassan said, "I don't know if there is no bomb, that's the problem." He then asked if he could speak to his probation officer.

[¶ 6] The detective arranged for Hassan to talk to his probation officer on the telephone. Following the call, Hassan told the detective that the probation officer said that he would be sent to a juvenile detention facility, and that he would not be going home. The detective again stated that his intention was to determine if he was dealing with a "jerk kid" or someone who had made a mistake. Hassan began crying and asked if the charge was a federal offense. The detective explained that it was not, but that because there had been

several recent school bomb threats, he needed to take this threat seriously. Hassan, still crying, said that he was late for work, that he was due to start college soon, that he had not done anything wrong in the past three years and asked, "what happened?" He then said "if you want to know my point of view, there was no bomb." The detective asked him if he was just bored and Hassan said that he was not bored, he was writing his resume and watching television. The detective asked him, "why the phone call?" and Hassan said, "I don't know" and that he needed to take care of his parents and sisters. The detective asked Hassan if he had anything to do with the bomb threats that had been called into other schools, and Hassan answered, "no." The detective then asked if it was a one-time stupid thing and Hassan answered, "yeah man."

[¶ 7] The detective left the room to call Hassan's probation officer, leaving Hassan crying in the room. When the detective returned he told Hassan that if he left there that day and did not come to terms with a mistake, there would be trouble. Hassan again stated, "I'm supposed to be at work man."

[¶ 8] The detective testified that, at some point that afternoon, the decision was made to arrest Hassan, "due to the fact that he was on probation [for a juvenile offense] in conjunction with the now new charges . . . ." Uniformed officers arrested Hassan and charged him with terrorizing, and took him to the Long Creek Youth Development Center.

[¶ 9] Hassan filed a motion to suppress the statements that he had made to the detective, arguing, inter alia, that they were the product of a custodial interrogation in violation of *Miranda*.[1]

---

1. In his motion to suppress, Hassan also argued that the statements were involuntary, his

[¶ 10] At the hearing on Hassan's motion, Hassan testified that after the detective started questioning him and made it clear that he was the only suspect, he did not feel free to go, particularly because the detective had told Hassan that he had his voice on tape. The detective testified that when he told Hassan to take responsibility for his actions, he considered him the prime suspect. He further testified that telling Hassan that he had his voice on tape, which was not true, was a "deceptive ploy," which was "designed to elicit the proper response, whether it be a confession or an adamant denial."

[¶ 11] When the court questioned the detective as to why he did not give Hassan the *Miranda* warning, the detective responded:

> It was my understanding that he was not going to be placed under arrest and was free to go, and when I asked him when he initially arrived—at the station if he felt he was free to go and he clearly stated that he was and felt he was there just to help us, I didn't feel that it was necessary.

The detective freely admitted to the court that Hassan was the only suspect. After questioning the detective as to whether it had been reported by the school that the voice was male and accented, the court asked the detective: "And you—you could identify it—he was there, apparently, with the opportunity to make the call, at the number ... called, and you were looking for him to implicate himself?" to which the detective responded that he was.

[¶ 12] The court concluded that the statements were not suppressible. In support of its conclusion, the court found that, after the police officers arrived at Hassan's residence, Hassan voluntarily gave a written statement to those officers acknowl-

edging that he was at home with his grandmother at the time that the bomb threat was called in; that Hassan speaks English well; that Hassan agreed to go to the police station, even though it was eight miles from his home; that the detective at the station was persistent, but "nonthreatening"; that the detective had told Hassan that he had a right to leave before questioning him, and that Hassan agreed that he felt free to leave at that time; that the detective then questioned Hassan for forty-five minutes; that Hassan provided statements to the officer, but whether such statements were inculpatory or exculpatory was for a jury to decide; and that the statements were not involuntarily given at that time. Following the denial of his motion to suppress the statements, Hassan entered a conditional guilty plea pursuant to M.R.Crim. P. 11(a)(2), and filed this appeal.

## II. DISCUSSION

■ [¶ 13] Hassan argues that the statements he made to the detective during the course of the interview at the police station should have been suppressed because they were made prior to a *Miranda* warning during the course of a custodial interrogation. "In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, *or* was not subject to interrogation." *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247, 254. In this case, there is no real dispute that the detective's direct questions, designed to elicit an incriminating response from Hassan, constituted "interrogation." *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d

Sixth Amendment right to counsel was violated, and that the interrogation arose after a

warrantless entry into Hassan's residence. None of these issues is before us on appeal.

297 (1980). The question before us is whether Hassan was in custody at the time of his interrogation by the detective.

■ [¶ 14] The test of whether an individual was in custody is an objective one, expressed as "whether a reasonable person, standing in the defendant's shoes, would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Bridges*, 2003 ME 103, ¶ 26, 829 A.2d at 254 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). Stated differently, the determination is "whether there was a 'restraint on freedom of movement' to the degree associated with formal arrest." *Bridges*, 2003 ME 103, ¶ 26, 829 A.2d at 254 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). We consider a number of factors in determining whether an individual was in custody:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) the subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*Bridges*, 2003 ME 103, ¶ 26, 829 A.2d at 254–55. We have stressed that "[t]hese factors are not to be viewed in isolation, but rather in their totality." *State v. Holloway*, 2000 ME 172, ¶ 19, 760 A.2d 223, 229.

■ [¶ 15] "The determination of whether an individual was in custody is a mixed question of fact and law." *Bridges*, 2003 ME 103, ¶ 25, 829 A.2d at 254. "We give deference to the trial court's factual determinations, but the determination of whether an individual was in custody requires an independent *de novo* review." *Id.* In concluding in *Bridges* that police questioning of a suspect was, in fact, custodial and that statements made as a result of this custodial interrogation were inadmissible, we noted the following facts: the interrogation took place in a small room with one blind-covered window and with both doors closed; although the defendant's mother drove her to the station, it was a trooper who made the initial contact with her; the defendant was told that she was free to leave, but she was also told that the police would not look for people she claimed were alternative suspects; the officers made false or misleading statements about evidence they purportedly uncovered, and took advantage of the defendant's feelings toward her young child, who was not with her during the interview; the defendant made known to the officers during the interview her belief that she was the prime suspect; the officers repeatedly told her that they did not believe her; the defendant endured questioning from four different detectives throughout three lengthy in-

terviews in a small room during which she became the detectives' prime suspect; she had been awake since 2:00 A.M.; she told the detectives on more than one occasion that she was not feeling well; she was emotional throughout the interview; she was separated from her child; she was without shoes; ... she had no means of transportation[;] and although she was not physically restrained, the defendant was isolated from her mother as well as from her child in a room in a firehouse hidden from public view. *Bridges,* 2003 ME 103, ¶¶ 27–33, 829 A.2d at 255–57.

[¶ 16] By contrast, in *State v. Higgins,* we determined that the interrogation of the defendant was noncustodial: although the interrogation was lengthy, the defendant agreed to speak with two detectives "in keeping with his earlier expressed desire to assist the police in their investigation"; "[h]e drove himself to the fire station where he was led to a wide-open room on the second floor"; no more than two detectives were in the room with the defendant at any one time; the detectives informed the defendant that "he was not in custody or under arrest and was free to leave," apparently both at the beginning and toward the end of the interview; the detectives never restrained the defendant; the door to the room was left open throughout the interrogation; the form of the interrogation was one of trying to bond with the defendant; "the detectives asked questions in a calm, conversational, friendly, and non-confrontational manner"; the officers never raised their voices; the detectives never informed the defendant that he was a suspect; the detectives offered the defendant a drink and permitted him to smoke; the defendant never attempted to leave and never indicated that he wished to terminate the discussion; and the defendant never expressed a desire to speak to an attorney. 2002 ME 77, ¶¶ 14–15, 796 A.2d 50, 55.

■ [¶ 17] In this case, although Hassan initially agreed to go to the police station, and stated at the beginning of the interview that he felt free to leave, he was interviewed in a small, windowless room in the police station, with the door closed at all times. The police station was eight miles from Hassan's home and he had no means of transportation. Like the defendant in *Bridges* and unlike the defendant in *Higgins,* Hassan did not initiate the contact with the police. Three uniformed officers initiated the contact with Hassan at his home and, although he went to the station voluntarily, it was in the back of a police cruiser at the request of the detective.

[¶ 18] Although the detective initially indicated that Hassan would not be arrested that day, at some point during the interview, the decision was made to keep Hassan in custody. The detective told Hassan that all of the evidence pointed to him, that he was the only suspect, that his voice was on tape, and that he should be a man and "stop bullshitting."

[¶ 19] Further, during the course of the interview, Hassan manifested his belief that he was not free to leave and the detective did nothing to reassure Hassan at that time that he was still free to leave. Hassan stated several times that he had to go to work, but the detective did not tell him that he could. Importantly, Hassan also stated to the officer, "if I leave right now, I'm going to jail," to which the detective responded, "I don't know that. Uniformed officers make that decision." Hassan was repeatedly told that all of the evidence pointed to him, and that the police had a recording of his voice making the bomb threat.

[¶ 20] At least from the time in the interrogation when the detective said, in

response to Hassan's question about going to jail, "I don't know," a reasonable person in Hassan's position would have believed that he was the focus of the investigation, and was not free to leave. Although Hassan was never subjected to physical restraint, and the duration of the interview itself was only forty-five minutes, weighing all of the factors and viewing the totality of the circumstances, including Hassan's status as an immigrant on probation for a juvenile offense, that he was miles from his home without transportation, and that the detective made it clear to Hassan that he was the only suspect, a reasonable person in Hassan's position would not have felt free to leave the police station. Hassan made his potentially incriminating statements after the point in the interview that the interrogation became custodial.

[¶ 21] The Superior Court erred in concluding that Hassan's statements were not suppressible as the product of a custodial interrogation.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.