STATE OF MAINE

CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND. SS
CLERK'S OFFICE

2007 AUG 28 A II: 00

SUPERIOR COURT
CRIMINAL ACTION
Docket No. CR-07-408
WSB- CUM-8/28/2007

STATE OF MAINE,

v.

DECISION

JOSHUA D. NIMON,

Defendant.

FINDINGS

1.    On February 12, 2007 Detective Scott Dunham of the Portland Police Department was assigned to investigate a suspicious injury to a 1½-year-old child.

2.    Detective Dunham spoke with Dr. Ritchie and Lindsey Burnes, the mother of the child. Detective Dunham learned that the child had suffered a fracture to the back of his head and a bruise to the chest, among other injuries.

3.    Detective Dunham returned to Maine Medical Center on either the 12th or the 13th, and met with defendant Joshua Nimon outside the Special Care Unit around noon.

4.    Detective Dunham at that time was accompanied by Detective Bailey and Charles Creteau, who is a child abuse investigator with the Department of Health & Human Services.

5.    Both detectives and Mr. Creteau were in civilian clothes. Detective Dunham had a gun that was concealed. There was no evidence that Detective Bailey displayed a gun.

6.    Detective Dunham introduced himself to Mr. Nimon and asked Mr. Nimon if he was willing to talk with them. Mr. Nimon agreed to talk.

7. The Special Care Unit was busy and the hospital staff provided Detective Dunham a quiet room where they could talk with Mr. Nimon. It was a large, empty waiting room with normal chairs and lamps.

8. The two detectives, Mr. Creteau and Mr. Nimon entered the room. Mr. Nimon sat closest to the door. Detective Dunham sat one to two feet away from him and Detective Bailey and Mr. Creteau sat further away. It is not clear whether the door was locked but it was closed. There was not at any time any physical restraint.

9. Detective Dunham did most of the questioning, which the State concedes was an interrogation, with Detective Bailey and Mr. Creteau occasionally asking questions.

10. Detective Dunham was at all times low-key, calm, and matter-of-fact. Detective Dunham used no profanity. He did not lie to Mr. Nimon or make any misleading statements. He did not suggest that Mr. Nimon was a coward for not confessing or exhort Mr. Nimon to act like a man and accept responsibility. He did not tell Mr. Nimon he was in trouble. There was no bullying.

11. Mr. Nimon at the beginning of the interrogation was somewhat nervous but calm, cooperative and coherent. Although he later told Mr. Creteau that he had "sniffed" a drug that day, Mr. Nimon was not under the influence. There was no evidence that Mr. Nimon was tired or had been awake for a long time. Mr. Nimon is not retarded or mentally ill. He is a 25-year-old high school graduate and was a college student at the time. On the witness stand he was calm, focused and gave the appearance of being reasonably intelligent.

12. Mr. Nimon was on probation. He testified at hearing that he felt he "had" to talk with Detective Dunham because he was on probation. I do not find this to be credible. Probationers have a duty to identify themselves as probationers when they

2

are questioned by the police but they do not have to give up their Fifth Amendment rights. Nor are they so advised. Nor did Mr. Nimon claim on the witness stand that anyone had told him he "had" to talk with the police or give up his Fifth Amendment rights.

13. Detective Dunham did not read Mr. Nimon his Miranda rights. Nevertheless, Detective Dunham started the interview by telling Mr. Nimon that regardless of what happened, he would not be arrested that day. Detective Dunham advised Mr. Nimon that he did not have to talk with them and he could leave any time he wanted to. Detective Dunham then asked Mr. Nimon if he understood. Mr. Nimon said he did understand and I am satisfied that he did.

14. Detective Dunham told Mr. Nimon that they were investigating a suspicious injury to Ms. Burnes' child and because Mr. Nimon was living with Ms. Burnes at the time of the injuries, they wanted to ask him what had happened.

15. Mr. Nimon first told a story about the child falling down. Mr. Nimon claimed that when he picked him up, the child accidentally hit his head.

16. Detective Dunham told Mr. Nimon that his story was not consistent with Dr. Ritchie's findings concerning the head injury. Detective Dunham suggested human beings do things they might regret under stress and asked Mr. Nimon if he wanted to change his story.

17. At this point Mr. Nimon started crying and admitted that when the child would not stop crying and would not take a certain medicine, Mr. Nimon grabbed the child and slammed him onto a thin mattress on the floor with the back of his head hitting the mattress.

18. At this point Detective Dunham had probable cause to arrest Mr. Nimon for aggravated assault. Detective Dunham and his partner did not tell Mr. Nimon that

3

they had probable cause. At not time did Detective Dunham or Detective Bailey or Mr. Creteau suggest anything had changed since the beginning of the interrogation (when Detective Dunham told Mr. Nimon that he was not going to be arrested, that he did not have to talk, and that he could leave any time he wanted).

19. Mr. Nimon did not ask if anything had changed. He did not ask if he was going to be arrested. He did not ask if he should consult his probation officer. He did not speak to his probation officer. He did not ask for a lawyer. He did not ask if he should be speaking. He did not say maybe he should leave. He did not ask for any clarification.

20. Detective Dunham asked Mr. Nimon if he could record the conversation. Mr. Nimon said no. It was not recorded.

21. Detective Dunham asked if he could return to the apartment and take the mattress for examination. Mr. Nimon agreed.

22. The interrogation lasted 30 to 45 minutes.

23. At the end of the interrogation, Detective Dunham stopped outside and talked with Ms. Burnes. Then he gave Mr. Nimon and Ms. Burnes an opportunity to talk before they all went back to the apartment to secure the mattress.

24. The police drove back to the apartment in their police car and allowed Mr. Nimon and Ms. Burnes to drive back together without a police officer inside their car.

25. At the apartment both Mr. Nimon and Ms. Burnes voluntarily agreed to a consent search and signed the consent search form. State's Exhibit #1.

26. Mr. Nimon declined to go to the police station that day for further questioning. He agreed to go to the police station the next day.

4

## DISCUSSION

I have analyzed my findings carefully in the light of *State of Maine v. Hamza Hassan*, 2007 ME 77, 925 A.2d 625; *State v. Bridges* 2003 ME 103, 829 A.2d 247; and *State v. Higgins* 2002 ME 77, 796 A.2d 50. I am satisfied by a preponderance that a reasonable person in Mr. Nimon's shoes would have felt at liberty to terminate the interrogation and leave. I am satisfied that there was no restraint on Mr. Nimon and that the situation did not come close to formal arrest.

I am also satisfied beyond a reasonable doubt that Mr. Nimon made an intelligent, knowing and rational decision to talk with Detective Dunham and his associates and that his answers were voluntary.

I am further satisfied that Mr. Nimon knowingly, intelligently, and voluntarily consented to the search of his apartment and any seizure resulting from the search.

The clerk shall make the following entry on the docket by reference:

Defendant's motion to suppress is denied in all respects.

DATED:     August 27, 2007

_____
William S. Brodrick
Active-Retired Justice, Superior Court

5