STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-15-2677

STATE OF MAINE

v.

ORDER ON MOTION TO SUPPRESS

DANIEL WHEATLEY

## Introduction

Pending is Daniel Wheatley's motion to suppress evidence arising out of statements made by him to Detective Daniel L. Violette of the Westbrook Police Department on January 14, 2015 concerning sexual contact from the period of 1991 to 1998 with Travis, when Travis was under 14-years of age.[1] Wheatley is charged with eight counts of gross sexual assault, Class A, 17-A M.R.S.A. § 253(1)(B). Wheatley alleges in his motion that any statements he made were involuntary and made in the absence of the *Miranda* warnings under *Miranda v. Arizona*, 384 U.S. 436. 478-79, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Wheatley relies in part on the fact that he is of below-average intelligence and was ill, throwing up at least six times during the interview. His motion raises questions about his ability to comprehend the circumstances and able to voluntarily make a statement.

At the hearing on the motion to suppress, the State presented three witnesses, Peter Donnelly, Psy.D. and Detectives Violette and Desjardins of the Westbrook Police

---

[1] Travis was a minor at the time of the criminal charges, but he is now an adult in his twenties. Daniel Wheatley believes to a 99.9% certainty that he is Travis' father and there was no evidence to the contrary. This matter became uncovered as a result of Travis's attempt, as an adult, to learn who his parents are. Although Daniel Wheatley's sister is Travis' mother, Mr. Wheatley's mother raised Travis. Travis and Daniel Wheatley were very close companions throughout most of Travis' life.

1

Department. The parties also stipulated to the admission of the forensic evaluation of Mr. Wheatley as well as a three-part audio/video police interview of Mr. Wheatley. After considering all of the evidence, this court concludes for the reasons set forth below that the motion to suppress is granted.

## Discussion

The record contains these facts bearing upon voluntariness of Wheatley's statement. The court focuses on voluntariness because the detectives did not advise Wheatley of his Miranda rights and that omission relates directly to Wheatley's ability to understand whether he was in custody or subject to interrogation and hence capable of voluntarily making a statement

Detectives Violette and Desjardins went to Wheatley's residence, dressed in plain clothes and identified themselves as detectives with the Westbrook Police Department. They stated that they wanted to talk to Wheatley "about a matter they were investigating relating to Travis." The detectives inquired whether he would come to the Public Safety Building to speak with the detectives. Once Wheatley said he would, the Detectives left. Just before they left, Wheatley asked whether he would need a lawyer. Detective Violette responded, "It is up to you." Detective Desjardin queried, "Why, do you need one?" Wheatley experienced the detectives' responses as confrontational. At no time, either at the residence or during the interview at the station, did the detectives advise Wheatley of the rights described in *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

After speaking with the officers, Wheatley showered, shaved and drove to the Westbrook Public Safety Building where Detective Violette met him in the vestibule of

2

the Building. Detective Violette escorted him to the interview room in the Criminal Investigation Office. The interview room was 12 x 12, with one door and a table with three chairs. The room was equipped with audio and video recording devices, which were activated without Wheatley's knowledge. Detective Desjardins monitored the interview in the monitoring room.

Detective Violette closed the door, stating "I closed the door for your privacy; don't want you to feel trapped in here." Violette told him that he met with Travis and wanted to discuss "stuff" reported by Travis yesterday. He told Wheatley that they discussed generally everything from when he was a child to the present. Violette stated that the discussion with Travis focused on Wheatley; revolved around Travis and Wheatley's relationship; and about Travis's mother being Wheatley's sister Ann. Violette advised Wheatley that Travis reported you and him were involved in sexual relations for an extended period of time. Violette told Wheatley, "Help me understand." Wheatley responded, "I know nothing about this. I took care of him since he was in diapers." Violette inquired, whether Wheatley was Travis' father. When Wheatley responded, "I don't know", Detective Violette inquired, "is it don't know or don't want to talk about it?" Wheatley responded, "Possibly both." Wheatley's facial expressions disclosed an anguished or troubled individual as the interview proceeded. Violette told Wheatley that Travis wanted to talk about that, that you or one of your brothers is his father. Detective Violette advised Wheatley, for the first time, he wants to help Travis find closure on that issue.

Occasionally during the few times Wheatley spoke during the interview, Wheatley moved off topic, such as discussing whether Travis has limitations. The

3

Detective sat to Wheatley's left and did most of the talking. Wheatley looked away from the Detective, staring off into the distance over his right shoulder. Wheatley went off topic again when Travis' girlfriend was mentioned. Violette brought him back on topic by stating, "Travis talked about the unusual relationship you have with each other; that is the focus of conversation with him and what I want to discuss with you." Detective Violette emphasized he was "on a quest for the truth." Throughout the interview, Violette continued to do most of the talking, repeating his statements and lecturing Wheatley on how he wants the truth from Wheatley.

Wheatley finally said, "I told him I could be his father," immediately throwing up, grabbing his stomach. Wheatley vomited at least six times during the hour and half interview, making contortions with his body, gagging, and appearing to be ill. At no time did Wheatley ask for help, nor did the officers offer him any help or stop the interview for him to calm down and gather himself. Indeed sometimes Detective Violette talked over Wheatley's vomiting. Finally Wheatley reported he told Travis that he was 99.9% sure he is his father.

Detective Violette moved on to their special relationship, stating "you grew up almost like brothers; there was a fair amount of sexual contact. Travis said started when 6-7 years old in his mom's house. Travis said the last time this occurred was in 2012." Wheatley's response was, "I don't know where this is coming from." Wheatley continued to deny any knowledge of these allegations of Travis. Detective Violette repeated that he is having a hard time believing that Travis made this up. Violette repeated, "My goal is to find out the truth about everything. Everything Travis said appeared to the truthful."

4

About half way through the interview Detective Desjardins entered to emphasize the need for Wheatley to tell the truth. Desjardins commented that obviously Wheatley was very stressed, throwing up when he came clean, and telling Wheatley that the truth about his sexual contact with Travis was the next hurdle he needed to overcome. Wheatley remained silent throughout Detective Desjardins' lecture. Desjardins repeated that Wheatley needed to tell the truth. When Wheatley vomited again, Desjardins left the room. Wheatley remained sullen and anguished throughout most of the interview.

Violette advised Wheatley, "You are going to tell the truth before you leave this building." In responding to Violette's repeated questions, Wheatley finally admitted, "The sex was consensual and never was anything forced upon Travis." Violette repeated to Wheatley, "We can't get closure until you get the weight of this off your shoulders. No more secrets." Violette continued to do the talking. Eventually Wheatley asked, "What else did Travis say?" When Violette responded, "The last time was in 2012", Wheatley interrupted stating, "No. 2013 moved in with me."

Violette switched gears, telling Wheatley, "Travis went into court and filed paperwork against you; this isn't going away; so the truth is going to come out; it is time to put the skeleton on the table." When Violette asked again when was the last sex act, Wheatley responded, "Am I boned right now? Am I f---ed?"

Violette switched gears asking whether first time with Travis was 6 or 7? Wheatley responded, "You are trying to make me say something. What is going to happen if I say yes?" Violette advised him, for the first time, "You are not going to be arrested today no matter what you tell me." Violette repeated that he is just trying to get information. Violette repeated that Travis is filing with the court, and the court is going

5

to open case and "if he tells court you forced him, you will be in trouble." Violette reported to Wheatley, "Travis said he thought this was how family members expressed love and it felt good," and then reminded Wheatley, "the truth will set you free." Wheatley responded by vomiting again. Wheatley was demonstrably in great distress. As Wheatley was actively vomiting, Violette told him, "This is a hard conversation but this is an opportunity to set things right."

At one point late in the interview, Violette advised Wheatley that when he leaves this room, he would leave the building and drive home. "Your coming to day was voluntary. This is your opportunity to tell your story. You are not going to be arrested today." Violette told Wheatley he is going to have to tell this information to the court. Wheatley asked, "After it goes to court, do I go to trial and then I go to jail?" Violette assured him "nobody is going to court or jail today." Violette stated he is just collecting information so the court can make a decision. Violette advised him, for the first time, that Travis is going to get a protective order from the court because Travis is afraid that Wheatley will hurt him because of what he reported about Wheatley. At this point, Wheatley appeared passive, disengaged. Wheatley did not provide information, but simply responded "yes", "no" or "I don't know." Violette continued talking repeatedly, finally asking again, "When was the first sexual contact." Wheatley responded, "I don't know." Violette asked was he living at Bridgton Road, to which Wheatley finally responded, "Yes." At another point, Violette noticed that he was losing contact with Wheatley and stated, "Wheatley come back and pay attention to what we are talking about here." Violette then returned to talking about Wheatley's need to disclose and tell the truth. Violette asked again, "How old when sexual contact? When was last time?"

6

Wheatley responded, "Don't know" to both questions. Violette said again, "Daniel pay attention. You don't want to remember." Violette continued to work on Wheatley repeating many of the things he previously said. Wheatley was in a very distressed state. Violette told him, "If you get this story out, you will not be throwing up because the poison will be out of you."

Wheatley finally conceded that "sex may have started at age 13" and said "it may have happened in Biddeford," but he didn't remember his mum catching them or it occurring in his mother's basement. Wheatley wrestled with what he could remember and what he could not remember. He said his wife doesn't know. Violette returned to his line of questioning, and asked, "Never threatened him, always consensual. Both wanted to do it?" Wheatley answered, "yes" to this question and then said, "everyone is going to want me dead." Violette lectured him again about establishing "Travis' genealogy and telling the truth." Wheatley again asked, "What is going to happen today? Will I get arrested?" Violette assured him again that no matter what he says, he is not going to be arrested today.

Near the end of the interview, Desjardins reentered the room. The detectives continued to question Wheatley about other people with whom he may have had sex. Wheatley continued to answer, "no," "maybe," "not positive, my son." When asked if his son reported the truth, Wheatley answered, "Yeah." He held his head in his hands, looked away, hung his head down. When Desjardins asked Daniel, why, Daniel responded, "Don't know why any of this happened." When Desjardins asked Wheatley whether he was sexually abused as a child, Wheatley responded, "Yes, by my sister." Wheatley again vomited. Desjardins kept talking through Daniel's wretching.

7

Finally, as the detectives tried unsuccessfully to get Daniel's father's address and his mother's telephone number, the detectives could not understand why Daniel could not answer these simple questions so they asked, whether he has been diagnosed with a mental illness? When Desjardins asked "mind if I look at your phone, Wheatley just handed the phone over and put his head down on his arm on the table. The detectives continued to question Wheatley, and he admitted to a few things with "yes" answers, but quickly returned to, "What will people think of me? Will I go to jail today?" Wheatley expressed concern that something would happen to his dad, although he denied that anything ever happened between him and his dad. The interview ended shortly thereafter.

Dr. Donnelly assessed Wheatley's mental state and emotional functioning to address issues of competency to voluntarily render statements. The assessment, including administration of various tests, lasted four hours. Mr. Wheatley is a 46-year old man who graduated from high school with a history of special education and dyslexia. He has worked maintenance for local businesses most of his life. He has no psychiatric history or criminal history. On the Wechsler Adult Intelligence Scale, he obtained an average score on perceptual abilities with borderline verbal comprehension skills. Learning disabilities in the language area were identified. His most pronounced area of deficit was his working memory, which was in the mildly impaired range. It was most difficult for him to retain information in his head and to operate on it. His general information processing speed was in the low average range. His overall scores resulted in intellectual functioning in the lowest end of the low average range.

Dr. Donnelly also expressed that Wheatley has substantially more difficulty with verbal reasoning, which is in the borderline range, as well as in expressive vocabulary,

which was his weakest score. He was identified as a hands-on learner, having had variable scores in the perceptual reasoning domain. His scores were quite depressed in the working memory area. These deficiencies could explain why even though he was told he would not go to jail, he continued to fear that he would be arrested that day.

On the reading and spelling tests of the Wide Range Achievement Test, his ability to read was at the 2.4 grade level and his ability to spell was at the 1.2 grade level.

Finally, on the Minnesota Multiphasic Personality Inventory, he has a likely history of gastrointestinal problems. He may be prone to developing physical symptoms in response to stress. According to Dr. Donnelly, Wheatley reported a diffuse pattern of cognitive difficulties and complained about memory problems, have a low frustration of tolerance, did not cope well with stress, and experienced difficulties in concentrating. Dr. Donnelly concluded, from the testing, that Wheatley's results were not suggestive of a major mental illness but of conditions related to somatoform disorder, or disorders that involved excessive stress and worry and possible suspicious thinking.

In evaluating Wheatley's free will and rational intellect, Dr. Donnelly stated his learning disabilities may well have played a role in his appreciation of the police interview process and his rights. He is "of low average intelligence with learning disabilities in the language area, including dyslexia, and with executive functioning problems that interfere with his concentration and short-term recall." Because of his concrete thinking, he may have had difficulties understanding the larger concept and implications for new situations. He was not particularly thinking about his need for a lawyer for his own purposes, thinking instead at the time he asked the officers whether he needed an attorney that the officers' questions would relate to Travis and his girlfriend's

9

difficulties. Wheatley was not aware that he did not have to go to the police station, he was not aware that he did not have to answer their questions and he was not aware that he was free to leave at any time. Wheatley did not begin to be concerned about his own situation and what was happening to him until midway through the interview.

Wheatley's free will may have been impaired by his suspicious thinking that if he did attempt to leave the he might be pepper sprayed to tazed, and that he might be tricked by the detectives. This is consistent with some findings on the psychological testing that indicated paranoid tendencies in his thinking with regard to the intentions of other people. His becoming physically ill was also consistent with psychological test findings that suggest he has a tendency to convert stress into physical symptoms. It did not occur to him when he became ill that he could ask to leave or stop the interview. Dr. Donnelly also opined that Mr. Wheatley has a limited cognitive profile where he can be susceptible to the manipulation of others. With regards to his police interview, and with his strategy of wanting to get the interview over by answering all of the questions, "he may well have felt pressed to answer questions, and he may have provided responses that were 'untrue' and that he began to say 'yeah, yeah, yeah' to questions and statements made by Detective Violet", just to get the interview over.

Dr. Donnelly stated, "Voluntariness in rendering statements, much like free will and rational intellect, relate to the defendant's internal state at the time of the police contact." Dr. Donnelly concluded,

Mr. Wheatley, who is not experienced with police interaction and who has long-term learning issues, likely did not fully appreciate the totality of the situation he was in, which likely affected the voluntariness of his participation. He did not recognize this as a situation in which initially he might be in any type of legal trouble. He did not recognize that he had rights in these types of situations to either leave, not to respond to questions, or ask for representation. When the questions turned to Travis Wheatley's allegations

10

against Mr. Wheatley, he described his emotional state as 'numb' and he said he 'froze'. Even at the point where he became violently ill, he did not recognize the interview setting as a situation in which he could chose not to respond to questions or ask for help.

On the concept of knowing, Dr. Donnelly stated, "Mr. Wheatley did not initially recognize that this was a situation where he might need or was entitled to legal representation." Dr. Donnelly conceded that the police might not have recognized that Mr. Wheatley had learning issues and that he might have benefited from a concrete explanation of his rights during the interview. As the interview went on, Mr. Wheatley became concerned that he would be arrested that day. It is at this point that the police assured him that he would not be arrested and that he would be leaving the interview, getting into his car and going home. Even with these assurances, Mr. Wheatley still jumped to other conclusions internally. It is no wonder, given that Violette also told Wheatley, "You are going to tell the truth before you leave this building."

He thought the police might be tricking him. For example, when the police asked if he were on medications, he thought that they were concerned whether he was going to need medications if they locked him up. He also misconstrued that he would go to jail, then to court and be appointed a lawyer at that juncture. He was even afraid to bring up again the question whether he needed a lawyer because he thought the detectives would get upset with him.

With regard to intelligence, Dr. Donnelly said that "intelligent is conceptualized in the forensic psychological literature as involving whether the provision of statements to the police was the product to rational understanding of the consequences and implications of making such statements." He concluded that in Mr. Wheatley's case,

> [I]t does not appear that he understood the questions being asked and was able to supply answers. However, he did not appear to recognize the consequences and implications of making such statements. Midway through the interview he began

11

to understand that he could be in 'big trouble' because of what was being alleged. It appears that his emotional stress response, his learning disabilities, and his compliance strategy of just answering questions in order to get them all answered and get the interview over combined to interfere with his ability to fully grasp the consequences of his judgment at that time. Given the seriousness of the allegations that he was being confronted with, notwithstanding his vomiting on numerous occasions, and having awareness that he could be in 'big trouble', at no time during this process did Mr. Wheatley feel he could request a lawyer or did not need to answer questions. This suggests that his ability to apply his basic intellectual capacity to appreciate the consequences of his participation in this interview was substantially limited."

## Miranda Warnings

"In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Hassan*, 2007 ME 77, ¶ 1, 925 A.2d 625, 628 (quotation marks and emphasis omitted). Even if Wheatley was not in custody, he was nevertheless subject to interrogation. Indeed, Wheatley continued to believe that he would be arrested, that he was going to jail, then to court and then he would get a court appointed attorney. He also did not understand that he could leave at any time. Indeed, he understood that he would not leave until he told the truth.

In determining whether a person was "in custody," the ultimate inquiry is whether a reasonable person standing in the shoes of the defendant would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *Id.* ¶ 2. The court's analysis of this issue is an objective one, guided by a number of factors, which the court considers in their totality. *See State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

Viewing the facts established at the suppression hearing in light of the *Michaud*

12

factors[2], Wheatley was interviewed by primarily one detective in a small interview room without any breaks even though he threw up at least six times during a one and one-half hour interview. The detectives had probable cause to arrest based on Travis' statements from the day before. The detectives did not tell Wheatley until well into the interview that he would leave at the end of the interview. And even though the detectives finally got around to telling Wheatley this, Wheatley continued to believe that he would be arrested, taken to court and then given a court appointed attorney. And, even though the detective told Wheatley he would be free to leave, this was in direct contrast to Detective Violette's statement to Wheatley, "You are going to tell the truth before you leave this building." Wheatley's concerns about what would happen to him were a product of his limited abilities. A reasonable person standing in the shoes of Mr. Wheatley and possessing ordinary intelligence would not have felt he was not at liberty to terminate the interrogation and leave or there was a restraint on freedom of movement of the degree associated with a formal arrest. Wheatley, on the other hand, had borderline verbal comprehension skills, learning difficulties in the language area, borderline range in verbal reasoning and in expressive vocabulary, was in the mildly impaired range of having a

---

[2] The objective *Michaud* factors are as follows: (1) the locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) the subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation.

working memory, in the low average range in information processing range and in the lowest range of low average range intellectual functioning. He also had conditions related to somatoform disorder, resulting in cognitive difficulties, memory problems and physical symptoms. Yet, this was an interrogation where the detective did most of the talking, failed to see if Wheatley needed a break or medical assistance, continued to interrogate Wheatley as he was wretching, and failed to ascertain or even wonder whether Wheatley was of limited mental capability. These were incomprehensible circumstances unfamiliar to Wheatley. As Dr. Donnelly observed,

> It appears that his emotional stress response, his learning disabilities, and his compliance strategy of just answering questions in order to get them all answered and get the interview over combined to interfere with his ability to fully grasp the consequences of his judgment at the time. Given the seriousness of the allegations that he was being confronted with, notwithstanding his vomiting on numerous occasions, and having awareness that he could be in 'big trouble', at no time during the process did Wheatley feel he could request a lawyer or did not need to answer questions. This suggests that his ability to apply his basic intellectual capacity to appreciate the consequences of his participation in this interview was substantially limited.

Under the totality of the circumstances, the state has failed to prove by a preponderance of the evidence that Wheatley was not in custody or was not subject to interrogation.

### Voluntariness

The burden is on the State to prove beyond a reasonable doubt that Wheatley's statements were voluntary. *See State v. Sawyer*, 2001 ME 88, ¶ 8, 772 A. 2d 1173. The court must consider the totality of the circumstances in determining whether a confession is voluntary. *Id.* at ¶ 7. "In order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect." *Id.* at ¶ 8 (citation omitted). Factors to consider in doing this analysis include

14

the following: details of the interrogation; duration of the interrogation; location of the interrogation; whether interrogation was custodial; recitation of the *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; any threats, promises or inducements made; and the defendant's age, physical and mental health, emotional stability and conduct. *Id.* at ¶ 9. "To be voluntary, a confession must be the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct." *State v. Bryant*, 2014 ME 94, ¶ 16 (quoting *State v. Nightingale*, 2012 ME 132, ¶ 17).

This court cannot say that Wheatley made a confession that was the free choice of a rational mind, fundamentally fair and not a product of coercive police conduct. Detective Violette conducted an interview of Wheatley that consisted primarily of Detective Violette's statements of what Travis had reported and repeatedly asking Wheatley whether is was true. For more than half of the interview, Wheatley, when he spoke, denied the allegations. Detective Violette kept lecturing him to tell the truth, telling him Travis' statements were truthful, telling him he did not believe Wheatley's denials. Detective Violette emphasized the need to bring closure for Travis and to get the family secrets out and how Wheatley would be relieved of the stress he was feeling if he came clean. Meanwhile, Wheatley was repeatedly vomiting and the detectives were talking at him and over his vomiting, without offering him any assistance. Although Violette insisted he was just trying to get to the truth and help Travis find closure, his questioning was accusatory and unceasing, even after he got the answers that would help Travis find closure. Throughout all of this, Wheatley did not understand that he could

15

stop the interview, leave the room or ask for an attorney. He was afraid to even ask for an attorney because of his fears around the officers and what they would do to him.

According to Dr. Donnelly, Wheatley did not have the capacity to voluntarily make a statement that was the product of his own free will and rational intellect. His learning disabilities played a role in his appreciation of the police interview process and his rights. His low average intelligence with learning disabilities in the language area and his executive function problems interfered with his concentration and short-term recall, all of which contributed to his difficulties understanding the larger concept and the implication for new situations. This was a new situation for Wheatley. He was not aware that he did not have to go; that he did not have to answer their questions; and that he was free to leave at any time. When the interview turned to Travis' allegations, Wheatley's internal process was to freeze and to become violently ill. He did not recognize the interview setting as a situation in which he could chose not to respond to questions or to ask for help. His ability to apply his basic intellectual capacity in this interview was substantially limited. Thus the state has failed to prove beyond a reasonable doubt that Wheatley's statements were voluntary.

The entry will be:

Defendant's motion to suppress is GRANTED. All statements made to Detective Violette and Desjardins are suppressed.

Date: April 28, 2016

Joyce A. Wheeler
Active Retired Justice, Superior Court

16

```
STATE OF MAINE                                    CRIMINAL DOCKET
  vs                                              CUMBERLAND, ss.
DANIEL WHEATLEY                                    Docket No  CUMCD-CR-2015-02677
26 ROWE AVENUE
PORTLAND ME 04101                                       DOCKET RECORD

DOB: 04/13/1969
Attorney: WILLIAM MASELLI                 State's Attorney: STEPHANIE ANDERSON
          LAW OFFICE OF WILLIAM MASELLI
          120 EXCHANGE ST 6TH FLOOR
          PORTLAND ME 04101
          RETAINED 06/16/2015

Filing Document: INDICTMENT                  Major Case Type: FELONY (CLASS A,B,C)
Filing Date: 05/07/2015
```

## Charge(s)

```
1   GROSS SEXUAL ASSAULT                           01/01/1991 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


2   GROSS SEXUAL ASSAULT                           01/01/1992 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


3   GROSS SEXUAL ASSAULT                           01/01/1993 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


4   GROSS SEXUAL ASSAULT                           01/01/1994 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


5   GROSS SEXUAL ASSAULT                           01/01/1995 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


6   GROSS SEXUAL ASSAULT                           01/01/1996 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


7   GROSS SEXUAL ASSAULT                           01/01/1997 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem


8   GROSS SEXUAL ASSAULT                           01/01/1998 WESTBROOK
Seq 637   17-A  253(1)(B)          Class A  Charged with INDICTMENT on Supplem
```

## Docket Events:

```
05/11/2015 FILING DOCUMENT -  INDICTMENT FILED ON 05/07/2015

05/11/2015 Charge(s): 1,2,3,4,5,6,7,8
```

SUPPLEMENTAL FILING - INDICTMENT FILED ON 05/07/2015
SARAH HEAD , ASSISTANT CLERK
05/11/2015 Charge(s): 1,2,3,4,5,6,7,8
HEARING - ARRAIGNMENT SCHEDULED FOR 06/16/2015 at 08:30 a.m. in Room No. 1


05/11/2015 SUMMONS/SERVICE - SUMMONS TO APPEAR FOR ARRAIGN ISSUED FOR 05/11/2015


06/16/2015 BAIL BOND - PR BAIL BOND FILED ON 06/16/2015


Date Bailed: 06/16/2015
B.DAY
06/16/2015 BAIL BOND - PR BAIL BOND COND RELEASE ISSUED ON 06/16/2015
MARY KELLY , JUDGE
DA: JULIA SHERIDAN
FTR1
Date Bailed: 06/16/2015
B.DAY
06/16/2015 Party(s): DANIEL WHEATLEY
ATTORNEY - RETAINED ENTERED ON 06/16/2015


Attorney: WILLIAM MASELLI
06/16/2015 Charge(s): 1,2,3,4,5,6,7,8
HEARING - ARRAIGNMENT HELD ON 06/16/2015
MARY KELLY , JUDGE
Attorney: WILLIAM MASELLI
DA: JULIA SHERIDAN
Defendant Present in Court


DEFENDANT INFORMED OF CHARGES. 21 DAYS TO FILE MOTIONS                    FTR1
06/16/2015 Charge(s): 1,2,3,4,5,6,7,8
PLEA - NOT GUILTY ENTERED BY DEFENDANT ON 06/16/2015
MARY KELLY , JUDGE
DA: JULIA SHERIDAN
06/16/2015 Charge(s): 1,2,3,4,5,6,7,8
HEARING - DISPOSITIONAL CONFERENCE SCHEDULED FOR 09/10/2015 at 10:00 a.m. in Room No. 7


06/16/2015 Charge(s): 1,2,3,4,5,6,7,8
TRIAL - JURY TRIAL SCHEDULED FOR 09/28/2015 at 08:30 a.m. in Room No. 11


NOTICE TO PARTIES/COUNSEL
08/25/2015 Charge(s): 1,2,3,4,5,6,7,8
HEARING - DISPOSITIONAL CONFERENCE NOTICE SENT ON 08/25/2015


09/10/2015 Charge(s): 1,2,3,4,5,6,7,8
HEARING - DISPOSITIONAL CONFERENCE CONTINUED ON 09/10/2015
JOYCE A WHEELER , JUSTICE
Attorney: WILLIAM MASELLI
DA: MICHAEL MADIGAN
CASE CONTINUED AT SIDEBAR FOR A CONFERENCE 12-10-15, 12-29-15 MOTION AND TRIAL 2-8-16.
MENTAL EXAM ORDERED.
09/10/2015 Charge(s): 1,2,3,4,5,6,7,8
TRIAL - JURY TRIAL CONTINUED ON 09/10/2015

09/10/2015 HEARING - DISPOSITIONAL CONFERENCE SCHEDULED FOR 12/10/2015 at 01:00 p.m. in Room No. 7

09/10/2015 TRIAL - JURY TRIAL SCHEDULED FOR 02/08/2016 at 08:30 a.m. in Room No. 11

NOTICE TO PARTIES/COUNSEL

09/11/2015 PSYCHIATRIC EXAM - ORDER MENTAL EXAM-OTHER ISSUES ENTERED ON 09/10/2015
JOYCE A WHEELER , JUSTICE
VOLUNTARINESS

09/21/2015 LETTER - FROM NON-PARTY FILED ON 09/21/2015

LETTER FROM STATE FORENSIC INFORMING PARTIES THAT AN EXAM IS SET 10-15-15 AT 9:00 AM.

11/23/2015 PSYCHIATRIC EXAM - ORDER MENTAL EXAM-OTHER ISSUES REPORT FILED ON 11/23/2015

COPIES SENT TO BOTH PARTIES 11-23-15

11/30/2015 HEARING - DISPOSITIONAL CONFERENCE NOTICE SENT ON 11/30/2015

12/10/2015 HEARING - DISPOSITIONAL CONFERENCE HELD ON 12/10/2015
PAUL A FRITZSCHE , JUSTICE
Attorney: WILLIAM MASELLI
DA: MICHAEL MADIGAN
CASE UNRESOLVED. MOTION HEARING TO BE SET APPROX. 3-15-16. 2-3 HOURS NEEDED. JURY TRIAL.
DATE CONTINUED.

12/11/2015 TRIAL - JURY TRIAL CONTINUED ON 12/10/2015

12/11/2015 TRIAL - JURY TRIAL SCHEDULED FOR 05/09/2016 at 08:30 a.m. in Room No. 11

NOTICE TO PARTIES/COUNSEL

12/11/2015 MOTION - MOTION TO SUPPRESS FILED BY DEFENDANT ON 09/10/2015

12/18/2015 CASE STATUS - CASE FILE LOCATION ON 12/18/2015

ON MARIAH'S SHELF TO SET A MOTION TO SUPPRESS HEARING. 2 1/2 TO 3 HRS NEEDED.

01/21/2016 HEARING - MOTION TO SUPPRESS SCHEDULED FOR 03/15/2016 at 01:00 p.m. in Room No. 7

NOTICE TO PARTIES/COUNSEL

01/21/2016 HEARING - MOTION TO SUPPRESS NOTICE SENT ON 01/21/2016

02/01/2016 MOTION - MOTION TO CONTINUE FILED BY DEFENDANT ON 02/01/2016

MOTION HEARING 3-15-16.

02/02/2016 MOTION - MOTION TO CONTINUE GRANTED ON 02/01/2016
PAUL E EGGERT , JUDGE
COPY TO PARTIES/COUNSEL

02/02/2016 HEARING - MOTION TO SUPPRESS CONTINUED ON 02/01/2016
PAUL E EGGERT , JUDGE

02/09/2016 HEARING - MOTION TO SUPPRESS SCHEDULED FOR 03/22/2016 at 08:30 a.m. in Room No. 11
JOYCE A WHEELER , JUSTICE
NOTICE TO PARTIES/COUNSEL

02/09/2016 HEARING - MOTION TO SUPPRESS NOTICE SENT ON 02/09/2016

03/22/2016 HEARING - MOTION TO SUPPRESS HELD ON 03/22/2016
JOYCE A WHEELER , JUSTICE
Attorney: WILLIAM MASELLI

DA: MICHAEL MADIGAN          Reporter: TAMMY DROUIN
Defendant Present in Court

HEARING BEGINS, ST WIT #1  DANIEL VIOLETTE, WESTBROOK PD, ST WIT #2  JOHN
DESJARDINS,WESTBROOK PD,ST WIT#3 DR. PETER DONNELLY, STATE REST, DEF REST, SJOINT EXHIBIT
#1 VIDEO OFFERED AND ADMITTED.  STATE'S ARGUMENT,DEFENSE ARGUMENT. COURT TAKES MATTER
UNDER ADVISEMENT.  COURT HAS FILE AND EXHIBIT.

04/29/2016 CASE STATUS -  CASE FILE RETURNED ON 04/29/2016

04/29/2016 CASE STATUS -  CASE FILE LOCATION ON 04/29/2016

W/JUSTICE WHEELER FOR MOTION TO SUPPRESS

04/29/2016 MOTION -  MOTION TO SUPPRESS UNDER ADVISEMENT ON 03/22/2016

05/02/2016 CASE STATUS -  CASE FILE RETURNED ON 04/29/2016

05/02/2016 MOTION -  MOTION TO SUPPRESS GRANTED ON 04/29/2016
JOYCE A WHEELER , JUSTICE
COPY TO PARTIES/COUNSEL
                                                   ALL STATEMENTS MADE TO
DETECTIVE VIOELLETTE AND DESJARDINS ARE SUPPRESSED.

A TRUE COPY
ATTEST: _____
                    Clerk