MCR/SE#212-19    4/15/19

STATE OF MAINE          STATE OF MAINE          UNIFIED CRIMINAL COURT
CUMBERLAND, ss          Cumberland, SS. Clerk's Office    DOCKET NO CR-2018-5291

STATE OF MAINE          APR 16 2019

v.          RECEIVE ORDER ON DEFENDANT'S
          )          MOTION TO SUPRESS
          )
SAMANTHA R. CAREY          )

 This matter came before the court on March 26, 2018 for hearing on Defendant's motion to suppress. Defendant was present and represented by Attorney Alexander E. Spadinger, Esquire. The State was represented by Assistant District Attorney Deborah A. Chmielewski, Esquire.

 At the onset of the hearing, Defendant clarified the issues raised by her motion to suppress. Specifically, Defendant challenges whether the officer has sufficient reasonable, articulable suspicion to request Defendant submit to field sobriety tests, whether there was sufficient probable cause to arrest defendant, and whether the State violated Defendant's federal and state rights under *Miranda v. Arizona*, 348 U.S. 436 (1966) and its progeny. The court heard the testimony of Benjamin Noyes and observed Defendant's Motion Exhibit 3, a recording of the traffic stop created by the officer's WatchGuard recording system.[1] Additionally the court reviewed Defendant's Motion Exhibits 1 and 2 as well. Following the hearing, the court took the matter under advisement. Having now considered all of the evidence and arguments presented, the court makes the following findings of fact and conclusions of law upon which the order set forth below is based:

 Benjamin Noyes is employed by the City of Portland as a patrol sergeant with the Portland Police Department He has been with the Portland Police Department for twenty-one (21) years.

 On September 22, 2018, Sgt. Noyes was working the 4:00 pm to 2:00 am shift. He was on routine patrol in the downtown area, in a marked cruiser equipped with the WatchGuard recording system. He was in full uniform. At approximately 11:00 p.m. Sgt. Noyes was traveling south on Union Street towards the area known as the "Old Port" area of downtown Portland. Sgt. Noyes observed a Jeep make an illegal U-turn against a red light at the intersection of Fore Street and Union Street. Sgt. Noyes waited as the traffic light cycled, and when the officer

---

[1] The State published the video during its presentation, but used what was marked as Defendant's Motion Exhibit 3 to publish the officer's WatchGuard video.

had a green light, he turned to follow the Jeep. Initially, there were two to three vehicles between Sgt. Parker's cruiser and the Jeep. As Sgt. Noyes continued to follow the Jeep, the vehicles between his cruiser and the Jeep turned off allowing Sgt. Noyes to travel directly behind the Jeep. Sgt. Noyes observed the Jeep turn onto Silver Street without using its directional light. Sgt. Noyes continued to follow the Jeep onto Silver Street. At the intersection of Silver and Commercial streets, the Jeep turned without coming to a complete stop at the stop sign. After observing the vehicle failing to stop for the stop sign, Sgt. Noyes activated his emergency lights and initiated a traffic stop. The Jeep pulled to the side of Commercial Street and stopped without incident. (*See* Defendant's Motion Exhibit 3 at 00:00 to 00:45.)

Sgt. Noyes approached the driver's side door of the vehicle and asked the driver to produce her license, registration and insurance card. In addition to the driver, Sgt. Noyes observed a female passenger in the front passenger seat. While waiting for the driver to produce the requested paperwork, Sgt. Noyes asked the driver where she was coming from. The passenger attempted to answer for the driver, stating "she's just picking me up, I'm drunk.". Sgt. Noyes again asked the driver where she was coming from and again the passenger attempted to answer. The passenger was told to allow the driver to answer. Sgt. Noyes again requested the paperwork from the driver. The driver attempted to hand Sgt. Noyes some paperwork in a envelop and asked if "that was it" referring to the requested paperwork. Sgt. Noyes instructed the driver to remove the item from the envelop. The driver then handed Sgt. Noyes her driver's license and insurance paperwork.

Sgt. Noyes identified the driver as Samantha Carey from her Maine State driver's license. Sgt. Noyes again asked where Ms. Carey was coming from, to which she answered "here." Sgt. Noyes asked Ms. Carey how much she had had to drink, to which she responded, "nothing." Ms. Carey then offered "I came from work." Sgt. Noyes inquired where she worked, and Ms. Carey stated "Maine Med." Sgt. Noyes again requested the registration paperwork. As Ms. Carey continued looking for the registration, Sgt. Noyes inquired where she were going. Ms. Carey stated Old Orchard Beach. At this point Ms. Carey can be heard stating "apparently" she could not find the registration. He then asked what time Ms. Carey got out of work, to which she said 7:00 pm. Sgt. Noyes then asked Ms. Carey where she went after work. Ms. Carey again answered, "here." She then informed Sgt. Noyes that she worked 7 to 7 shift, and noted that she needed to be back in the following day. Sgt. Noyes asked a third time where Ms. Carey had been after work, and again she answered "here." Her passenger then stated "the Old Port." At this point Sgt. Noyes asked Ms. Carey how much she had had to drink, and again she stated "nothing."

2

In looking for her registration, Ms. Carey initially provided Sgt. Noyes with a yellow sales receipt. Although the registration paperwork was at the top of the papers in Ms. Carey's hand, she filed through the paperwork a three times before she located the registration paper. After a few minutes looking, Ms. Noyes was eventually handed her registration to Sgt. Noyes. Sgt. Noyes then informed Ms. Carey of the traffic infractions that he observed.[2] Ms. Carey offered that she was not familiar with the area. Again Sgt. Noyes asked how much Ms. Carey had had to drink, and she answered "I haven't." The officer noted that Ms. Carey was wearing a wrist band from a local brewery and asked her about it.

During this initial contact with Ms. Carey, Sgt. Noyes noted the odor of alcohol coming from the vehicle.[3] He also noted that Ms. Carey's eyes were bloodshot and glassy, her pupils were dilated, and there was a slight slur in her speech. Sgt. Carey then returned to his cruiser. Sgt. Noyes had been with Ms. Carey for approximately four (4) minutes as this point. (*See* Defendant's Motion Exhibit 3, at 1:00 to 04:45.)

The officer then returned to his cruiser. Approximately three minutes later, Sgt. Noyes, returned to Ms. Carey's window and asked her to step out of her vehicle. By this point a second officer had arrived (per department policy) to backup Sgt. Noyes who was going to conduct field sobriety tests. When Sgt. Noyes asked Ms. Carey to step out of the vehicle, both Ms. Carey and her passenger became excited, stating that she wanted to talk to her lawyer. Sgt. Noyes opened the driver's side door and said come out here. Sgt. Noyes continued to ask Ms. Carey to step out of the vehicle. The passenger began arguing with the officer, asserting that Ms. Carey had a right not to step out and to have a lawyer.

---

[2] Sgt. Noyes informed Ms. Carey about the illegal U-turn, failing to use her turn signal at the right hand turn onto Silver Street, and making a right hand turn onto Commercial Street without first stopping at the stop sign.

[3] The court heard testimony regarding three cans observed in the passenger side door pocket. Sgt. Noyes testified at the motion to suppress that he believed one of the cans to be a Corona Light beer can, but that he was unable to determine what the other two cans contained. Two versions of the officer's report were produced and admitted as Defendant's Motion Exhibit 1 and Defendant's Motion Exhibit 2. Sgt. Noyes testified, credibly, that he initially drafted his report within 45 minutes of the stop, and then modified the report before it was submitted for approval by his supervisor. The report was printed both before and after the modification. The court does not rely in any instance on the cans located in the passenger door in its analysis. The cans were next to the intoxicated passenger, and not near to the driver during any of the officer's interaction with the operator, and do not play a role in the court's determination regarding reasonable articulable suspicion and the officer's request the Ms. Carey perform field sobriety tests.

3

Sgt. Noyes warned the passenger about obstructing the investigation, and again asked Ms. Carey to step out of the vehicle. He then stated, "One way or another you have to come out of the car." At this point Ms. Carey then said that she wanted to call her father, and she reached into the center console of her vehicle. Sgt. Noyes, who did not initially know what Ms. Carey was reaching for, grabbed her arm and asked her again to step out of the vehicle. Realizing the Ms. Carey had grabbed her phone, Sgt. Noyes took her phone out of her hand and set it on her dash board. Ms. Carey said "I'm calling my dad." The passenger continued to speak loudly. Sgt. Noyes instructed that the passenger could call the father while Ms. Carey stepped out of the car. At this point Ms. Carey said "I will." Sgt. Noyes released her arm, Ms. Carey stepped out of the vehicle and went to the back of the vehicle. (Defendant's Motion Exhibit 1, at 7:45 to 9:20.)

Once at the back of the vehicle, the officer began instructing that Ms. Carey had two choices, that she could do field sobriety tests, whereupon, and before Sgt. Noyes indicated what the second choice might be, Ms. Carey stated "I will, I've done it before, its fine." Sgt. Noyes informed Ms. Carey that he was going to conduct field sobriety tests to determine whether or not Ms. Carey was sober enough to drive home.

Prior to beginning the field sobriety tests, Sgt. Noyes asked Ms. Carey if she has smoked any marijuana or was taking any medications, to which she replied no. Sgt. Noyes then asked if Ms. Carey had any injuries that would affect her ability to drive a car or to perform the requested tests. Again, Ms. Carey answered in the negative.

Sgt. Noyes first explained the HGN test to Ms. Carey. She interrupted him during the explanation, but then followed his instructions, and Sgt. Noyes administered the test. [4] Sgt. Noyes observed six out of six clues during this test: lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and the onset of nystagmus prior to 45 degrees in both eyes. Ms. Carey had no difficulty standing while the HGN test was performed. While administering this test, Sgt. Carey observed the smell of alcohol coming from Ms. Carey's breath.

---

[4] While Sgt. Noyes was explaining the test, Ms. Carey's passenger, inquired of the assisting officer if she could leave. The passenger was informed that she could leave the area. After a minute she got out of the vehicle, but rather than walking away, she attempted to speak to Ms. Carey as Sgt. Noyes was conducting the HGN test. The passenger was again warned about the consequences of obstructing government administration. After a brief exchange between the passenger and the assisting officer, the passenger walked away. who had gotten out of the vehicle, was permitted to leave the area. (Defendant's Motion Exhibit 3, at 10:00 to 12:40.)

Sgt. Noyes next asked Ms. Carey to perform the "Walk and Turn" test.[5] The area that the test was conducted was paved and flat. Prior to starting the test, Sgt. Noyes asked Ms. Carey to stand in the instructional position and watch as he demonstrated the test. Sgt. Noyes identified three clues during this test: Ms. Carey stepped off the imaginary line, she missed heel to toe in both directions and she raised her arms for balance.

Finally, Sgt. Noyes conducted the One Leg Stand test. He explained the test, and asked if Ms. Carey understood the test, which she indicated that she did. As Sgt. Noyes was explaining the test to Ms. Carey, he noted that her body swayed slightly from side to side. During the test, Ms. Carey counted ten 1,000 twice, then she put her foot down at twenty 1,000 and looked to the officer saying "like I don't know. How long do you want me to go for?" She was told to continue the test until instructed to stop, which she did. At the end of this test Sgt. Noyes informed Ms. Carey that he believed that she had either been drinking or had taken some sort of medication. He then asked Ms. Carey to rate her level of intoxication on a scale of 1 (completely sober) to 10 (most intoxicated ever been) and she indicated that she believed she was a three, saying it had been a rough week at work. At the end of the field sobriety tests, Sgt. Carey informed Ms. Carey that he was placing her under arrest for operating under the influence.[6]

In order to justify a brief investigatory stop a police officer must have an "objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur based on the totality of the circumstances." *State v. Porter*, 2008 ME 175, ¶8, 960 A.2d 321, 323 (quoting *State v. Sylvain*, 2003 ME 5¶11, 814 A.2d 984, 987.) "An investigatory stop is valid when it is 'supported by specific and articulable facts which, taken as a whole and together with the rational inferences from those facts, reasonably warrant the police intrusion.'" *State v. Taylor*, 1997 ME 81, ¶9, 694 A.2d 907 (quoting *State v. Hill*, 606 A.2d 793, 795 (Me 1992). "[R]easonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *State v. Porter* 2008 ME 175, ¶9, )(quoting *State v. Burgess*, 02001 ME 117, ¶8, 776 A.2d 1223, 1227.) See also *State v. Sampson*,

---

[5] While the test was being demonstrated to Ms. Carey, her passenger returned, and again attempted to communicate with Ms. Carey. The passenger was instructed to leave the area which she eventually did. (Defendant's Motion Exhibit 3, at 13:20 to 14:20.)

[6] Ms. Carey's passenger again returned, and after multiple exchanges with the officers she was also placed under arrest. (Defendant's Motion Exhibit 3, at 18:50 to 21:03.)

"the reasonable suspicion standard requires less than probable cause that a crime was being committed, but more than speculation or an unsubstantiated hunch." *Sampson*, 669 A.2d at 1328 (Me 1996) (quoting *State v. Caron*, 534 A.2d 978, 979 (Me. 1987). "This standard balances the driver's right to be free from excessive restraint by the State against the public's right not to be placed at risk by an impaired driver." *State v. Porter*, at ¶9.

In this case, Sgt. Noyes observed Ms. Carey's vehicle do an illegal U-turn, turn without signaling, and fail to completely stop at a stop sign. He initiated a traffic stop for the various infractions. In speaking with Ms. Carey, the officer noted an odor of alcohol coming from the vehicle and that Ms. Carey's passenger was intoxicated. Ms. Carey's speech was slightly slurred, her eyes were bloodshot and glassy, her pupils were dilated. Ms. Carey also had difficulty producing her registration, even though it was in her hand as she was looking for it. Based on the totality of the officer's observations he had reasonable articulable suspicion that Ms. Carey may be impaired, sufficient to warrant further investigation through field sobriety tests.

When Sgt. Noyes asked Ms. Carey to step out of the vehicle so he could conduct field sobriety tests, Ms. Carey was seized for the purposes of Fourth Amendment analysis. "'A seizure of the person occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he (or she) is not fee to walk away.'" *State v. White*, 2013 ME 66, ¶11, 70 A.3d 1226, 1230 quoting *State v. Cilley*, 1998 ME 34, ¶7, 707 A.2d 79. The next question in the analysis is whether or not such seizure was reasonable. *Id.*. "A seizure is reasonable if made pursuant to an investigative detention based on reasonable suspicion of criminal activity, or if made pursuant to an arrest based on the higher standard of probable cause that a crime has been committed." *Id.* at ¶12, (quotations and citations omitted). During such an investigative detention, the officer may take actions that are "reasonably related in scope and circumstances which justify the detention." *Id.*, at ¶ 13.

Sgt. Noyes' actions, in requesting that Ms. Carey exit her vehicle so that he could conduct field sobriety tests were reasonable based on his observations of the various traffic infractions, followed by her slightly slurred speech, bloodshot and glassy eyes, dilated pupils, evasive answers about where she had been that night, and the odor of alcohol coming from the vehicle contrasted with Ms. Carey's denial that she had consumed any alcohol that night. At this point, Ms. Carey did not get out of the vehicle when requested by Sgt. Noyes. Based on the exchange between Sgt. Noyes and Ms. Carey, including the continued interjection of her passenger and Ms. Carey grabbing for her phone, his continued

6

detention did not exceed what was necessary to dispel the suspicion that led to his initial detention, and therefore the roadside detention prior to arrest did not rise to the level of a *de facto* arrest. *Id..* The length of detention, approximately eighteen minutes, although longer than some, was not so unreasonable, based on the totality of the facts and circumstances, including Ms. Carey's behavior and the interjections of her passenger, as to be an unlawful detention. Finally, even if the circumstances of the detention amounted to a *de facto* arrest, Sgt. Noyes had sufficient probable cause, at the time of his initial request, that Ms. Carey's senses were "affected to the slightest degree, or to any extent" by the consumption of alcohol. *See State v. Webster*, 2000 ME 115, ¶7, 754 A.2d 976.

Ms. Carey asserts that she submitted to the field sobriety tests as a result of compulsion. The Maine Constitution provides that "[i]n all criminal prosecutions, the accused . . . shall not be compelled to furnish or give evidence against himself or herself ..." Me. Const., art. I, §6. The Fifth Amendment of the United States Constitution protects an individual from being "compelled in any criminal case to be a witness against himself." U.S.Const. amend. V. The Law Court has held that evidence that is "nontestimonial is not within the privilege against self-incrimination, and neither the Fifth Amendment of the United States Constitution, nor article I, section 6 of the Maine Constitution prohibits the use of nontestimonial evidence." *State v. Millay*, 2001 ME 177¶15, 787 A.2d 129, 132, see also *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 L.Ed. 2d 528, 110 S.Ct. 2638 (1990), *State v. McKechnie*, 1997 ME 40, ¶8-9, 690 A.2d 976, 978-979 and *Schmerber v. California*, 384 U.S. 757, 761, 16 L.2d 2d 908, 86 S.Ct. 1826 (1966). The Law Court has also held that "admission into evidence of a defendant's performance on field sobriety tests did not violate the defendant's privilege against self-incrimination because the evidence was nontestimonial." *Id.. See also State v. Eastman*, 1997 ME 39, ¶¶ 10, 691 A.2d 179, 182-183. "[A] defendant's performance on field sobriety tests is nontestimonial in nature." *State v. Bragg*, 2012 ME 102, ¶13, 48 A.3d 769, 773, citing *State v. Millay*, 2001 ME 117, ¶15. Further, because a defendant's performance on field sobriety tests is nontestimonial in nature, so to is a refusal to perform field sobriety tests. *State v. Millay*, 2001 ME at ¶15.

Ms. Carey exited her vehicle after numerous requests by Sgt. Noyes. During that period, Ms. Carey's passenger repeated interjected and told Ms. Carey not to cooperate. Just prior to exiting the vehicle, Ms. Carey reached for her phone which caused the officer to grab her arm. At this point, Ms. Carey indicated that she would get out of the vehicle, and she exited the vehicle. There was one backup officer present in addition to Sgt. Noyes. Once out of the vehicle, Ms. Carey was cooperative and performed the field sobriety tests. Once Ms. Carey was

placed in custody, she made some statements, but such statements were not a result of any interrogation by the officers, but rather spontaneous statements made by Ms. Carey during the arrest.

Ms. Carey also argues that her statements to Sgt. Noyes should be suppressed as she was functionally under arrest, and such statements violated her rights under *Miranda v. Arizona*, 348 U.S. 436 (1966). "In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Bragg*, 2012 ME 102, ¶8, 48 A.3d 769, 773, quoting *State v. Bridges*, 2003 ME 103 ¶23, 829 A.2d 247. Whether a person is in custody depends on "whether a reasonable person standing in the defendant's shoes, would have felt he or she was not at liberty to terminate the interrogation and leave." *Id..* When Ms. Carey was speaking to Sgt. Noyes, she was not under arrest. She was the subject of a roadside stop, which was a brief and temporary investigatory stop. See *Bragg*, at ¶9. This brief detention to investigate is consistent with the characteristics of a *Terry*-type stop that does not rise to the level of custody for Fifth Amendment purposes. See *Bragg*. Ms. Carey was not in custody during this conversation. Once she was placed under arrest, she was not interrogated. The court finds that Ms. Carey was not subject to an interrogation for the purposes of *Miranda*.

Based on the foregoing, Defendant's Motion to Suppress is DENIED.

Dated: April 15, 2019

Deborah P. Cashman
Judge, Maine District Court